## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DAVANT SCARBOROUGH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Civil Action No. _____ |
| AT&T INC. and JOHN STANKEY, | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and | ) | DEMAND FOR JURY TRIAL |
| | ) | |
| WARNER BROS. DISCOVERY, INC., | ) | |
| | ) | |
| Nominal Defendant. | ) | |
| | ) | |

### VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT FOR VIOLATIONS OF §§10(B) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934

Plaintiff Davant Scarborough ("Plaintiff"), by and through the undersigned attorneys, submits this Verified Stockholder Derivative Complaint (the "Complaint") on behalf of nominal defendant Warner Bros. Discovery, Inc. ("Warner Bros. Discovery," "WBD," or the "Company"), formerly known as Discovery, Inc. ("Discovery"), against AT&T Inc. ("AT&T") and AT&T CEO John Stankey ("Stankey") (together, "Defendants"). The allegations in this Complaint are based on the knowledge of Plaintiff as to himself, and on information and belief as to all other matters, including the investigation of Plaintiff's counsel, which included, among other things, a review of the Company's filings with the U.S. Securities and Exchange Commission ("SEC"), conference call transcripts, Company press releases, and analyst and media reports about the Company. Plaintiff believes that substantial additional evidentiary support for the allegations set forth herein will be obtained through discovery.

**INTRODUCTION**

1.      This is a derivative action on behalf of Warner Bros. Discovery for violations of the Securities Exchange Act of 1934 (the "Exchange Act") in connection with the merger of Discovery with AT&T's spun-off WarnerMedia business (the "Transaction").  Plaintiff is a WBD stockholder who is seeking to hold the Defendants—AT&T and its CEO John Stankey— responsible for the harm that they caused to the Company in connection with the Transaction.

2.      Prior to the Transaction, when it was known as Discovery, the Company was a publicly-traded media enterprise that provided content across cable television, direct-to-consumer, and other distribution platforms, including reality-based programming though media outlets such as the Discovery Channel, HGTV, the Food Network, and streaming service Discovery+, among others.  Owned by AT&T, WarnerMedia was a media company whose assets included Warner Bros. Pictures, HBO, streaming service HBO Max, DC Comics, CNN, TBS, and TNT, among other media properties.  AT&T acquired the WarnerMedia assets in a 2018 transaction that is widely considered to be a major corporate blunder.

3.      On May 17, 2021, Discovery and AT&T announced the Transaction, in which WarnerMedia was spun off from AT&T and acquired by Discovery, which changed its name to Warner Bros. Discovery.  The negotiations that resulted in the Transaction were led by AT&T's CEO Stankey and Discovery's (now WBD's) CEO, David Zaslav ("Zaslav").

4.      In connection with the Transaction, AT&T misled Discovery by materially overstating WarnerMedia's financial performance and misrepresenting and concealing the severity of WarnerMedia's financial and business difficulties.

5.      As revealed in a post-Transaction investigative report in *The New York Times*, AT&T knowingly omitted approximately $350 million in start-up costs for WarnerMedia's

streaming news service CNN+ from the projections and budgets that it provided to Discovery. Then-CNN President Jeff Zucker raised alarms internally that these costs needed to be disclosed, but as AT&T has since acknowledged, AT&T withheld this information from Discovery.

6.    According to *The New York Times*, after the Transaction closed and WBD executives gained access to WarnerMedia's financial records, it was "hard to overstate Mr. Zaslav's dismay at what AT&T had left behind."  These records not only "finally reflected the $350 million at CNN+" but also revealed "accounting tactics that Discovery believed overstated revenue and understated costs" at WarnerMedia, leaving Zaslav "especially upset at what he saw as projections that had overstated the value of Warner Media."  As reported, Zaslav "express[ed] anger" but "had to tread carefully, given that AT&T appointed seven of Warner Bros. Discovery's 13 board members."

7.    AT&T also misled Discovery about other aspects of WarnerMedia's business, including by omitting the fact that WarnerMedia had "largely halted" the external content sales that were critical to WarnerMedia's revenue generation.  Such external content sales involve selling a show produced by a WarnerMedia-owned studio to a network or streaming service.  For example, years ago, the Warner Bros. Television studio created and sold the popular sitcom *Friends* to broadcast network NBC, where *Friends* originally aired for many years.  Unbeknownst to Discovery, in the lead-up to the Transaction, WarnerMedia largely stopped such external content sales in favor of hoarding shows for streaming service HBO Max, throwing off the financial projections for WarnerMedia that AT&T provided to Discovery and rendering AT&T's representations to Discovery misleading.

8.    In light of these facts, the WarnerMedia financial statements and projections that AT&T provided to Discovery—and, in turn, AT&T's representations in the merger agreement that

those statements fairly presented WarnerMedia's financial position—were materially false and misleading.

9.     On February 4, 2022, Discovery issued a final amended Form S-4 and proxy statement/prospectus for the Transaction (the "Proxy") that included the false and misleading financial statements and projections for WarnerMedia that AT&T had provided to Discovery. In addition, on March 28, 2022, AT&T filed an information statement/prospectus for the Transaction (the "Information Statement") that also included that false and misleading information.  Pursuant to the misleading Proxy, the Transaction was approved by Discovery stockholders (apart from its Class C common stockholders, who had no opportunity to vote) on March 11, 2022, and it closed on April 8, 2022.

10.     Since the Transaction, WBD has publicly acknowledged that the WarnerMedia projections that AT&T provided in advance of the Transaction were vastly overstated.  For example, in its August 4, 2022 earnings call, WBD disclosed that, having "now had an opportunity to fully assess legacy WarnerMedia's financials post closing," WBD "determined that certain legacy WarnerMedia budget projections that were made available to us prior to closing, varied from what we now view as legacy WarnerMedia's budget baseline post closing," resulting in significantly lower earnings projections.  As a result, WBD was "starting from a less favorable position compared to our expectations."  As one equity research analyst noted, this announcement made clear that the Company had "overpaid significantly for the acquired [WarnerMedia] assets," "which is pretty surprising for a deal of this scale to say the least."  Analysts also noted that the one party that benefitted from the Transaction was AT&T, which was able to unwind its disastrous acquisition of the WarnerMedia assets.

11.     This action asserts, on behalf of the Company, claims under Sections 10(b) and 20(a) of the Exchange Act against AT&T and its CEO Stankey.  AT&T, under Stankey's control, materially misled Discovery concerning WarnerMedia's financial position. This directly led to Discovery massively overpaying for the WarnerMedia assets in the Transaction, acquiring at an artificially inflated price the stock of the entity into which AT&T spun-off its WarnerMedia assets, including the assumption of $40.4 billion in debt to fund a payout to AT&T in the Transaction.

12.     This harm to the Company cannot be redressed via a demand on its current board of directors (the "Demand Board" or the "WBD Board") because a majority of its 11 members have material conflicts.  Among other reasons detailed below, seven Demand Board members were designated to their positions by AT&T, of whom four were on AT&T's board and owned significant positions in AT&T stock when AT&T engaged in the violations described herein. Three other Demand Board members materially benefitted from the Transaction or are not independent from those who received such benefits.

## JURISDICTION AND VENUE

13.     Plaintiff's claims arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.

14.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.  The federal courts have exclusive jurisdiction over the claims asserted in this action under Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

15.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b), because the Company is incorporated in this District.

16.     In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

17.     Plaintiff Davant Scarborough was a beneficial owner of Discovery common stock at all relevant times.  Through the Transaction, Mr. Scarborough became a beneficial owner of shares of Warner Bros. Discovery, which he currently holds.

18.     Defendant AT&T Inc. is a Delaware corporation with principal executive offices located at 208 South Akard Street, Dallas, Texas, 75202.  In connection with the Transaction, AT&T spun off its WarnerMedia business, and AT&T stockholders received 0.241917 shares of WBD common stock for each AT&T share they owned.[1]

19.     Defendant John Stankey is the Chief Executive Offer of AT&T and has served in that role since July 2020.  Stankey has worked at AT&T since 1985.  He was previously the CEO of WarnerMedia from June 2018 through April 2020, and was the President and Chief Operating Officer of AT&T from October 2019 to July 2020.

20.     Together, AT&T Inc. and Stankey are referred to herein as the "Defendants."

21.     Nominal Defendant Warner Bros. Discovery, Inc. (formerly known as Discovery, Inc.) is a Delaware corporation with principal executive offices located at 230 Park Avenue South,

---

[1]     On March 9, 2022, in an unrelated matter, the Delaware Court of Chancery held after a full trial that AT&T breached its fiduciary duty of loyalty by engaging in wrongful conduct by, among other things, "provid[ing] false answers . . . to minority partners' questions during [] meetings . . . ." and "with[holding] important pieces of information from PwC, such as board presentations about the buyouts and information about revenue . . . ."  *In re Cellular Tel. P'ship Litig.*, 2022 WL 698112, at *22, *24 (Del. Ch. Mar. 9, 2022).

New York, New York 10003. The Company's shares are registered on the Nasdaq Global Select Market and trade under the ticker symbol "WBD." Prior to the Transaction, Discovery had three classes of common stock: (a) Series A common stock, which was entitled to one vote per share; (b) Series B common stock, which was entitled to ten votes per share, and 91% of which were owned by John Malone and entities affiliated with him; and (c) Series C common stock, which had no voting rights. Discovery also had two classes of preferred stock, Series A-1 and Series C-1, which were convertible into nine shares of Discovery's Series A common stock and 19.3648 shares of Discovery's Series C common stock, respectively, subject to anti-dilution provisions. Since the Transaction, Warner Bros. Discovery has had one class of common stock.

## RELEVANT NON-PARTIES

22.     David M. Zaslav has served as the President and Chief Executive Officer of Discovery since 2007, and he is now the President and CEO of Warner Bros. Discovery. Previously, Zaslav was President of Cable & Domestic Television and New Media Distribution of NBC Universal, Inc., a position he left in December 2006. He has been a director of Grupo Televisa S.A.B. since 2015 and Sirius XM Radio, Inc. since 2013, and was previously a director of Blade Air Mobility, Inc. from May 2021 until September 2021 and Lions Gate Entertainment Corp. ("Lions Gate") from 2015 until May 2021. At the time of the Transaction, Zaslav held Series A stock that gave him direct control over approximately 2% of Discovery's aggregate voting power, and he also had voting and purchase rights over John Malone's Series B Discovery shares.

23.     Gunnar Wiedenfels has been Chief Financial Officer of Discovery since April 2017 and currently serves as Chief Financial Officer of Warner Bros. Discovery.

24.     John C. Malone ("Malone") has served as a director of Discovery since 2008 and is now on the board of Warner Bros. Discovery. At the time of the Transaction, Malone held

approximately 20% of Discovery's aggregate voting power through his ownership of approximately 91% of Discovery's super-voting Series B stock.   In connection with the Transaction, Malone entered into a voting agreement that required that he and certain affiliated entities vote their Discovery Series A and Series B common stock in favor of the Transaction. Malone previously served as CEO and Chairman of the board of directors of Discovery Holding Company from 2005 to 2008, when it merged with Discovery.  Malone is currently chairman of the boards of Liberty Media, Liberty Broadband, and Liberty Global.  Malone has served as a director of Liberty Broadband since 2014, Liberty Media (including its predecessors) since 2010, and Liberty Global (including its predecessors) since 2005.  He previously served as a director of GCI Liberty, Inc. from 2018 to 2020, Lions Gate from 2015 to 2018, Liberty Expedia Holdings, Inc. from 2016 to 2019, Liberty Latin America Ltd. from 2017 to 2019, Expedia, Inc. from 2005 to 2017, and Charter from 2013 to 2018 (where he has served as director emeritus since 2018). Malone also served as CEO of Tele-Communications Inc. ("TCI") for over 25 years until its merger with AT&T Corporation in 1999.

25.     Paul A. Gould ("Gould") has served as a director of Discovery since 2008 and is now on the board of Warner Bros. Discovery.  Gould served on the Compensation Committee of Discovery's board and was that committee's lead spokesperson in discussions with Zaslav.  Gould previously served as a director of Discovery Holding Company from 2005 to 2008 and has served as a director of Radius Global Infrastructure, Inc. since 2020, Liberty Latin America since 2017, and Liberty Global since 2005.  Gould has also worked at Allen & Company ("Allen & Co.") since 1972, including as a Managing Director and Executive Vice President for more than five years. Discovery engaged Allen & Co. as one of two financial advisors in connection with the Transaction.

26.     Robert R. Bennett ("Bennett") has served as a director of Discovery since 2008 and now serves on the board of Warner Bros. Discovery.  Bennett was also a member of the Discovery board's Transaction Committee.  Bennett previously served as President of Discovery Holding Company from 2005 to 2008, and he is currently Managing Director of Hilltop Investments, LLC. He was also one of the founding executives of Liberty Media, serving as its Principal Financial Officer from its inception in 1991 until 1997 and as its President and Chief Executive Officer from 1997 to 2005.

27.     J. David Wargo ("Wargo") served as a director of Discovery from 2008 through the closing of the Transaction.  Wargo was also a member of the Discovery board's Transaction Committee.  He has served as director of Liberty TripAdvisor Holdings, Inc. since August 2014, Liberty Global since June 2013 (having previously served as a director of Liberty Global, Inc. from June 2005 to June 2013), and Liberty Broadband since March 2015.  He also was a director of Liberty Media International, Inc. from May 2004 to June 2005.

28.     Robert J. Miron ("R. Miron") served as the Chair of Discovery's board from May 2014 until the Transaction closed in April 2022.

29.     Allen & Co. is a private boutique investment advisory firm that provided financial advice and issued a fairness opinion to Discovery's board in connection with the Transaction.  In exchange for providing financial advisory services to Discovery, Allen & Co. received $75 million in fees.  In October 2016, Allen & Co. represented Time Warner in its sale to AT&T and received $50 million in fees.  Allen & Co. is considered a "consummate niche player" in the media,

entertainment, and technology spaces.[2]   Its business model and "specialty"[3] is "forging long-lasting and lucrative relationships with corporate leaders."[4]   One way Allen & Co. cultivates relationships is through its annual Sun Valley Conference.  Every July, Allen & Co. hosts an ultra-exclusive, invite-only conference in a remote region of Sun Valley, Idaho.[5]   Referred to as "Billionaire Summer Camp,"[6] the conference "gives executives a chance to meet, mingle and discuss deals in private, with all discussions and proceedings off the record."[7]   Over the years, "several major mergers, acquisitions and other deals have reportedly been made following discussions at the Sun Valley conference, such as [Jeff] Bezos' purchase of *The Washington Post* as well as Disney's acquisition of ABC."[8]   Repeat guests include Zaslav, Malone, Aryeh Bourkoff (LionTree), Jason Kilar (former CEO of WarnerMedia), Mark Zuckerberg, Tim Cook, Bill Gates, Warren Buffet, Jeff Bezos, and Elon Musk, among others.  These relationships are highly valuable to Allen & Co.  "Allen & Company will often slip into a deal more because of its relationships rather than its ability to execute.  As a result, the firm is rarely, if ever, the sole advisor in large deals: it will usually co-advise with other banks (sometimes swooping in last minute) and allow

---

[2]      Carol J. Loomis, *Inside The Private World of Allen & Co. Putting A Premium On Personal Ties, This Family Firm Thrives In The Land of Giants*, CNN MONEY (June 28, 2004), https://money.cnn.com/magazines/fortune/fortune_archive/2004/06/28/374371/index.htm.

[3]      *Id.*

[4]      *Id.*

[5]      Soo Kim, *Sun Valley Conference 2021: Billionaire Summer Camp Explained and Who Is Attending*, NEWSWEEK (July 9, 2021), https://www.newsweek.com/sun-valley-conference-2021-billionaire-summer-camp-explained-who-attending-1608334.

[6]      *Id.*

[7]      *Id.*

[8]      *Id.*

them to do the heavy lifting."[9]  Discovery and WBD board member Gould is a Managing Director and Executive Vice President of Allen & Co.

30.     J.P. Morgan Securities LLC ("J.P. Morgan") is a bulge-bracket investment bank that provided financial advice, issued a fairness opinion, and committed $41.5 billion in debt financing (with Goldman Sachs, among others) in connection with the Transaction.  For its financial advisory services rendered to Discovery, J.P. Morgan received an aggregate fee of $15 million ($12 million of which was contingent and payable upon closing).  For its debt financing role in connection with the Transaction, J.P. Morgan anticipated receiving approximately $140 million in fees.  During the two-year period preceding delivery of its opinion, J.P. Morgan received $7 million in aggregate fees from Discovery and approximately $80 million in aggregate fees from AT&T.

## FACTUAL ALLEGATIONS

**A.     AT&T Is Saddled With Massive Debt as a Result of Its Disastrous Acquisition of Time Warner**

31.     The Transaction stemmed from AT&T's failed $85 billion acquisition of Time Warner Inc. in 2018.  Considered "one of the greatest corporate strategy blunders of recent decades,"[10] AT&T's acquisition of Time Warner, which became WarnerMedia after the acquisition, cost "a great American company tens of billions of dollars at a time of intense competition in its industry."[11]

---

[9]      Herbert Allen III, *Allen & Co. - An In-Depth Review*, WALL STREET OASIS (Sept. 11, 2016), https://www.wallstreetoasis.com/forum/investment-banking/allen-co-an-in-depth-review.

[10]     Geoff Colvin, *AT&T's Warner Media Debacle Broke The Two Most Fundamental Principles of M&A Strategy*, FORTUNE (May 17, 2021), https://fortune.com/2021/05/17/atts-warner-media-merger-hbo-warner-bros-discovery.

[11]     *Id.*

32.     When AT&T first announced its planned purchase of Time Warner in 2016, AT&T made clear that it had enormous aspirations for WarnerMedia, expecting it to generate about 15% of the combined company's revenues.[12]   With cord-cutting millennials starting to depress cable provider revenues in 2016, many of AT&T's investors and analysts cherished the prospect of AT&T "cutting out the cable middleman and delivering entertainment directly to people's TVs, laptops and phones."[13]

33.     The U.S. Department of Justice ("DOJ") filed a lawsuit against AT&T and Time Warner in the U.S. District Court in Washington, D.C. to block the proposed merger.  After a six-week trial, the court sided with AT&T and Time Warner on June 12, 2018, allowing the companies to complete the merger.  AT&T announced that it had acquired Time Warner three days later.

34.     Despite its BBB+ S&P credit rating, AT&T's net debt at the time of its Time Warner acquisition was already "significant," standing around $120 billion.[14]  To finance the Time Warner acquisition, AT&T absorbed an additional $40 billion in bridge financing as well as Time Warner's $23.3 billion in net debt.   Altogether, following the closing of the Time Warner acquisition, AT&T's net debt rose to $180 billion, which generated concern from analysts and

---

[12]     Gina Narcisi, *AT&T Dumps Time Warner Business Four Years After $85b Deal*, CRN (Apr. 5, 2022),   https://www.crn.com/news/networking/at-t-dumps-time-warner-business-four-years-after-85b-deal.

[13]     Joe Bel Bruno, *AT&T Buys Time Warner In Transformative Hollywood Deal For Cord-Cutting Age*, THE HOLLYWOOD REPORTER (Oct. 22, 2016), https://www.hollywoodreporter.com/news/general-news/at-t-time-warner-deal-940706/;   James B. Stewart, *Was This $100 Billion Deal the Worst Merger Ever?*, THE NEW YORK TIMES (Nov. 19, 2022), https://www.nytimes.com/2022/11/19/business/media/att-time-warner-deal.html.

[14]     Trefis Team, *Why AT&T Is Buying Time Warner*, FORBES (Oct. 24, 2016), https://www.forbes.com/sites/greatspeculations/2016/10/24/why-att-is-buying-time-warner/?sh=82e1696758dc.

investors.  In June 2018, Moody's[15] and S&P Global Ratings[16] cut AT&T's credit rating to Baa2 and BBB, respectively, just two notches above junk bonds.

35.    After the Time Warner acquisition closed, AT&T's legal battle with the DOJ continued.  The DOJ appealed the District Court's decision in August 2018, effectively asking the D.C. Court of Appeals to unwind the merger.  The Court of Appeals allowed the merger to stand in February 2019, but the combination would not last much longer than the extensive battle to complete it.

36.    In March 2019, key members of Time Warner's top management left for other media companies.[17]  Stankey, an AT&T veteran with little media experience, became CEO of WarnerMedia, and later AT&T's CEO.

37.    AT&T struggled to integrate the WarnerMedia businesses. For example, AT&T attempted to create an advertising platform called "Xandr" that was intended to bring Facebook-style personalization to television.  AT&T believed it could combine its scale and customer data with Time Warner's content, such as on CNN and HBO, to supercharge the value of its TV advertisements.  Xandr was seen as so vital to AT&T's future that Xandr's CEO, Brian Lesser, reported directly to Randall Stephenson, AT&T's chairman and CEO.  Xandr's results would also be broken out separately on AT&T's quarterly statements.  The name of the initiative further

---

[15]    Molly Smith, *Moody's Cuts AT&T Credit Rating Citing Billions Of Debt From Time Warner Deal*, BLOOMBERG (June 15, 2018), https://www.bloomberg.com/news/articles/2018-06-15/at-t-cut-by-moody-s-as-time-warner-deal-adds-billions-of-debt?sref=tDOVkv8p.

[16]    *S&P, Moody's Downgrade AT&T Following $85.4B Time Warner Deal*, S&P GLOBAL MARKET INTELLIGENCE (June 16, 2018), https://www.spglobal.com/marketintelligence/en/news-insights/trending/ruxr-rq5qlgzlfwnyfqlrw2.

[17]    Peter Kafka, *Everyone Who Used To Run Time Warner Is Out The Door Less Than A Year After AT&T Paid $85 billion For The Media Giant*, VOX (Mar. 18, 2019), https://www.vox.com/2019/3/18/18271285/warner-bros-sex-scandal-kevin-tsujihara-att-time-warner-top-executives-out.

signified its importance by evoking Alexander Graham Bell, the inventor of the telephone and founder of AT&T. However, it has been reported that no one really knew how Xandr was supposed to work.[18]

38.     Former Time Warner executives have made clear that, under AT&T's ownership, "a vibrant culture of creative energy and success nurtured over decades" at WarnerMedia businesses such as HBO "was destroyed in months."[19]  Indeed, a report in *The New York Times* detailing the many problems resulting from AT&T's acquisition of Time Warner was headlined: "*Was This $100 Billion Deal the Worst Merger Ever?*"[20]  According to commentators, AT&T's acquisition of Time Warner went "down in the annals of mid-'10s hubris, when a telecom looked in the mirror and saw—not the nation's second-largest phone provider—but a genuine rival to Facebook, Apple and Google."[21]  In short, "for sheer strategic miscalculation and poor execution, AT&T's management of Warner Media may have no rival in recent corporate history."[22]

**B.     Hobbled by Debt And With Its Stock Price in Decline, AT&T Becomes Motivated To Sell WarnerMedia**

39.     By October 2020, AT&T's stock had fallen below $21.00 per share, the first time in over nine years (since January 2011) that AT&T's stock traded at that level. During this same period, the S&P 500 was up approximately 85%. The Factset stock chart below illustrates AT&T's failure to integrate WarnerMedia. From the closing of its acquisition of Time Warner in 2018

---

[18]     Gene Maddaus & Brent Lang, *AT&T's WarnerMedia Era Ends: How Culture Clashes, Massive Debt and Donald Trump Doomed the Merger*, VARIETY (Apr. 8, 2022), https://variety.com/2022/digital/news/att-warnermedia-debt-donald-trump-discovery-john-stankey-jason-kilar-merger-1235226663.

[19]     Stewart, *supra* n.13.

[20]     *Id.*

[21]     Maddaus & Lang, *supra* n.18.

[22]     Stewart, *supra* n.13.

through mid-2021, AT&T (blue below) drastically underperformed the S&P 500 (pink) and two

of its main competitors, Verizon (orange) and Comcast (green):



40.    Under AT&T's ownership, WarnerMedia's streaming services like HBO Max

underperformed in relation to competitors like Netflix and Disney.  Meanwhile, AT&T was facing

pressure to reduce its debt in order to invest heavily in building its 5G wireless network to keep

pace with other mobile carriers.  As reported in *The New York Times*:

> [T]he recurring public relations headaches and financial pressures appeared to be
> weighing on Mr. Stankey. He was ready to wash his hands of the entire media
> enterprise. At the time, AT&T was faced with a $5 billion or more capital
> investment to deploy 5G spectrum. That cost, on top of the added billions being
> consumed by HBO Max, meant AT&T began unraveling its ambitious foray into
> media.[23]

---

[23]    *Id.*

41.     Throughout 2020 and 2021, AT&T and Stankey prioritized reducing AT&T's debt load, as Stankey made clear during earnings calls with investors:

> We plan to use free cash flow after dividends for the next couple of years to pay down debt.  We remain focused on monetizing noncore assets and using those funds for debt reduction as well.  We're committed to sustaining our dividend at current levels and we'll give top priority to debt reduction at this time.[24]

> We're still on track to have a sizable reduction in debt by year end through a combination of strong free cash flows and proceeds from asset monetization.  We'll continue to focus on debt reduction.  We expect our net debt to adjusted EBITDA[25] to be around 3 times by year end.[26]

42.     Consistent with its debt reduction strategy, in February 2021, AT&T announced the sale of DirecTV, resulting in "a loss to shareholders of about $49 billion."[27]  Still, at the end of 2021, AT&T had nearly $180 billion in debt.  AT&T's foray into the media business ended up destroying tens of billions of dollars in market capitalization, forcing it to slash its dividend, and costing thousands of jobs.

43.     After AT&T had spent so much time fighting to acquire the WarnerMedia assets, the massive amount of debt it incurred prompted AT&T to unload those assets.  In 2022, many WarnerMedia executives, including Ann Sarnoff (the former chairperson and CEO of Warner Bros.) and Jason Kilar (the former CEO of WarnerMedia), lost their jobs, and WarnerMedia employees were left demoralized as more layoffs were planned.  Other key executives at WarnerMedia who subsequently lost their jobs included HBO boss Richard Plepler (who is now

---

[24]     AT&T, 2020 Q4 Earnings Call Transcript (Jan. 27, 2021).

[25]     Earnings before interest, taxes, depreciation, and amortization.

[26]     AT&T, 2021 Q1 Earnings Call Transcript (Apr. 22, 2021).

[27]     Stewart, *supra* n.13.

producing shows for Apple TV) and Turner executives David Levy and John Martin. To top it off, AT&T lost Warner Bros. studio head Kevin Tsujihara to a sex scandal in April 2020.[28]

44.     With AT&T's stock price depressed and debt levels exceedingly high, AT&T was motivated to sell the assets it had acquired in its failed Time Warner transaction. As discussed below, in the course of this process, AT&T misled Discovery about WarnerMedia's financial condition and projections.

## C.     Zaslav and Stankey Negotiate the Transaction

45.     The Transaction was directly negotiated between Zaslav, the CEO of Discovery, and Stankey, the CEO of AT&T. Throughout those negotiations, AT&T and Stankey materially misled Discovery about WarnerMedia's financial condition and prospects. In particular, AT&T and Stankey concealed from Discovery the severity of WarnerMedia's financial and business challenges, overstated WarnerMedia's financial performance, misled Discovery concerning WarnerMedia's content sales strategy, and concealed $350 million in start-up costs for CNN+ from the projections and budgets that it provided to Discovery in connection with the Transaction.

46.     Zaslav proposed the idea of the Transaction to his friend Stankey on February 13, 2021. While commiserating about missing the annual AT&T Pebble Beach golf tournament (due to the COVID-19 pandemic) "where the two friends had planned to meet,"[29] Zaslav, who was watching the Golf Channel at his oceanfront East Hampton estate, wrote Stankey: "You around….

---

[28]     Aaron Pressman, *Who Is New AT&T CEO John Stankey?*, FORTUNE (Apr. 24, 2020), https://fortune.com/2020/04/24/new-att-ceo-john-stankey-2020; *see also* Kafka, *supra* n.17.

[29]     Kenneth Li & Krystal Hu, *How A Golf Tournament Led To The Merger Of Discovery, WarnerMedia*, REUTERS (May 17, 2021), https://www.reuters.com/technology/how-canceled-golf-tournament-led-merger-discovery-warnermedia-2021-05-17.

I've been thinking…." with emoticons of a golfer and sunglasses.  Stankey replied a few minutes later: "Always scares me when you do that :) …Would you like to chat?"[30]

47.     Zaslav and Stankey spoke on the phone that same day, and Zaslav proposed the idea of combining Discovery with AT&T's WarnerMedia business.  Their initial conversation about the possible Transaction lasted several hours, and it followed multiple earlier conversations between Zaslav and Stankey about potential opportunities for Discovery and AT&T to work together in other contexts as well as the industry generally.

48.     During the ensuing discussions between Zaslav and Stankey, "Malone spoke every day with [] Zaslav as the Discovery chief executive laid plans for the ambitious deal."[31]

49.     On March 2, 2021, Zaslav and Stankey met at Zaslav's home in New York City to continue discussions regarding a possible combination of Discovery and WarnerMedia.  Zaslav and Stankey continued to discuss the potential combination on a number of calls over the course of March 2021.  During those calls, Zaslav and Stankey discussed preliminary views about the relative values of Discovery and WarnerMedia and the proposed capital structure of a combined company.  Stankey indicated that AT&T would only be interested in a business combination that would result in a governance structure with a single class of common stock.

---

[30]     John Koblin et al., *Inside the Discovery-AT&T Deal: Cute Emails, a Big Loan and Now, a Media Giant*, THE NEW YORK TIMES (May 21, 2021), https://www.nytimes.com/2021/05/21/business/media/att-discovery-warnermedia-deal.html; Georg Szalai & Alex Weprin, *Discovery CEO David Zaslav on WarnerMedia Deal: Relationships With Talent Will Be "Number One Priority"*, THE HOLLYWOOD REPORTER (May 17, 2021), https://www.hollywoodreporter.com/business/business-news/discovery-att-deal-ceo-stankey-zaslav-1234954116.

[31]     Dawn Chmielewski, *Warner Media Deal Lands Another AT&T Win For Cable Billionaire John Malone*, FORBES (May 17, 2021), https://www.forbes.com/sites/dawnchmielewski/2021/05/17/warnermedia-deal-lands-another-att-win-for-cable-billionaire-john-malone/?sh=42bae39a55bb.

50.    That same day, Zaslav separately called Malone and recounted his meeting with Stankey.  Over the next few days, Zaslav also discussed his meeting with Stankey and the proposed Transaction with Bennett and Gould.

51.    In mid-March 2021, Discovery engaged Allen & Co. as a financial advisor with respect to a potential transaction.  At that time, Gould served as Managing Director and Executive Vice President of Allen & Co.  Discovery would later engage J.P. Morgan as an additional financial advisor on May 8, 2021.  There is no indication that Discovery interviewed any other bankers for these roles.

52.    On March 30, 2021, Zaslav, together with members of Discovery's management team and Allen & Co., updated Malone and Gould on the status of the proposed Transaction, including possible transaction structures.

53.    On April 1, 2021, Zaslav and Stankey, together with other members of the senior management teams of Discovery and AT&T, met in person to discuss the proposed Transaction. They discussed certain prospective financial information regarding Discovery and WarnerMedia, as well as their preliminary views as to the relative values of Discovery and WarnerMedia and the proposed capital structure of the combined company.

54.    On April 6, 2021, Discovery and AT&T management, along with their outside counsel, held a call to discuss possible structures for the proposed Transaction.  They had a follow-up call on April 8, 2021, again to discuss possible structures for the proposed Transaction.

55.    On April 9, 2021, Discovery and AT&T provided each other with access to virtual data rooms containing information about Discovery and WarnerMedia to facilitate the parties' due

diligence work streams.   Accessing confidential information about a potential transaction counterparty by means of a data room is an essential part of the due diligence process.[32]

56.     AT&T revoked Discovery's and its advisors' access to AT&T's data room on April 18, 2021, having determined that the parties had not made material progress.  That same day, Zaslav had a call with LionTree (one of AT&T's financial advisors) to discuss whether there was a path forward for continued engagement.

57.     The day after his call with LionTree, Zaslav continued to drive the deal forward on the Discovery side, updating Malone and Gould along with other members of Discovery's senior management team and representatives from Allen & Co.

58.     On April 23, 2021, Zaslav initiated a formal meeting of the Executive Committee of Discovery's board, which included R. Miron, Malone, Bennett, and Zaslav himself (the "Executive Committee").  At this meeting, Wiedenfels presented the Executive Committee with two sets of internal forecasts, the "Advocacy Case" and the more pessimistic "Management Case," and recommended that the Executive Committee focus on the Management Case.  Following discussion at the meeting, the Executive Committee directed management to continue negotiating with AT&T and to report to the full board as negotiations progressed.

59.     Zaslav then resumed discussions with AT&T, and AT&T reinstated access to its virtual data room for Discovery and its advisors.

60.     On April 25, 2021, Zaslav and Stankey had a call regarding the proposed Transaction's terms.  Zaslav proposed that AT&T's stockholders receive 68% of the outstanding

---

[32]     *See* INVESTOPEDIA, https://www.investopedia.com/terms/v/virtual-data-room-vdr.asp ("A virtual data room (VDR), also known as a deal room, is a secure online repository for document storage and distribution. It is typically utilized during the due diligence process preceding a merger or acquisition to review, share, and disclose company documentation.").

shares in the combined company, with $42 billion in debt transferring with the WarnerMedia assets to the combined company.

61.    AT&T responded by sharing a draft term sheet with Discovery on April 27, 2021, pursuant to which it would receive 73% of the combined company and Zaslav would continue to serve as CEO of the new company.  In connection with continuing to serve as CEO, Zaslav requested, and received, a new employment agreement (the "New Employment Agreement"), with substantially higher compensation than his existing deal, effective upon the signing of the merger agreement.

62.    The full Discovery board held its first meeting concerning the Transaction on the same day.  At the meeting, Zaslav updated the full board on the proposed Transaction and his discussions with Stankey.  The board also reviewed long-range forecasts for Discovery prepared by Discovery management, as well as long-range forecasts for WarnerMedia based on information provided by AT&T.  Wiedenfels reiterated the position he asserted at the Executive Committee meeting that the board should focus on Discovery's more pessimistic "Management Case" forecasts rather than the "Advocacy Case" forecasts.

63.    On April 28, 2021, Zaslav called Stankey and presented Discovery's counterproposal, including that AT&T's stockholders would receive 70% of the combined company and that $43 billion in debt would transfer with the WarnerMedia business.

64.    Discovery sent a revised draft term sheet to AT&T the next day.  Zaslav and Stankey, together with other members of the senior management teams of Discovery and AT&T, then engaged in further negotiations about the equity ownership interest in the combined company to be received by AT&T and Discovery stockholders and the amount of debt transferring with the WarnerMedia business.

65.     After those discussions, the senior management teams of Discovery and AT&T agreed, subject to the approval of their respective boards, that AT&T's stockholders would receive 71% of the equity ownership in the combined company on a fully diluted basis, that Discovery's stockholders would receive the remaining 29% of the combined company, and that $43 billion in debt would transfer with the WarnerMedia assets to the combined company, subject to adjustment. (This debt figure was adjusted to $40.4 billion by the time the Transaction closed.)  Discovery also accepted the other terms set forth in AT&T's April 27, 2021 draft term sheet, including with respect to the proposed structure of the Transaction and the post-closing governance and capital structure of Discovery.

## D.     AT&T and Stankey Hid Known Costs and Overstated WarnerMedia's Projections

66.     In connection with the Transaction, AT&T and Stankey concealed massive costs at WarnerMedia from Discovery and overstated WarnerMedia's revenues and income, thus materially misleading Discovery about WarnerMedia's financial condition and projections.

67.     Among other things, AT&T hid massive start-up costs at CNN+ from Discovery. CNN+ is a now-defunct direct-to-consumer streaming service for news content which had been in development since early 2020,[33] and was a key element of WarnerMedia's digital strategy:

> CNN revealed plans for CNN+ in July 2021, billing it as the network's most important venture since its founding in 1980. [CNN President Jeff] Zucker called it a bold and necessary foray into subscription-based digital news at a time when consumers were abandoning traditional cable television. Hundreds of new employees would be brought on to produce eight to 12 hours of live programming a day.

> Crucially, AT&T—which at the time controlled WarnerMedia and CNN—was onboard.

---

[33]     Trung   Phan,   *CNN+   vs.   Quibi*,   WORKWEEK   (Apr.   23,   2022), https://workweek.com/2022/04/23/cnn-vs-quibi/.

AT&T had already agreed to spin off WarnerMedia to Discovery and leave the entertainment and news business.  But in June 2021, leaders at the telecom giant met with Mr. Zucker in Dallas and approved a $1 billion budget over four years for CNN+.

Mr. Zucker went on a hiring spree, enticing stars like Eva Longoria, who signed on for a Mexico-based travel show, and Audie Cornish, the former NPR star.  A March 2022 start date was set.[34]

68.     Moreover, CNN itself is a critical part of the WarnerMedia business, with at least $1 billion in profits every year from 2016 through 2020, and an estimated $1.25 billion in profits in 2021.[35]  This compares to WarnerMedia's total operating income of approximately $7.28 billion in 2021 and $8.21 billion in 2020.[36]

69.     AT&T concealed the true costs of CNN+ from Discovery in connection with the Transaction.  After the Transaction closed, a November 19, 2022 report in *The New York Times* revealed that Discovery was investigating "**allegations that AT&T engaged in questionable accounting tactics to inflate the projections on which the value of the Warner[Media] assets was based**."[37]

70.     Specifically, in June 2021, Jeff Zucker, who was leading CNN at the time, "made a presentation in Dallas to AT&T's board, asking to approve the CNN+ launch and for $350 million to spend on it, which he got.  He hired an array of expensive talent like the Fox News

---

[34]     John Koblin et al., *Inside the Implosion of CNN+*, THE NEW YORK TIMES (Apr. 24, 2022), https://www.nytimes.com/2022/04/24/business/media/cnn-plus-discovery-warner.html;  *see also id.* (WarnerMedia CEO Jason Kilar "planned to include some CNN+ content with HBO Max, while still offering CNN+ as a stand-alone service. . . .  It would be hard to overstate how important this moment is for CNN,' [Kilar] wrote on Twitter on the day the service started.").

[35]     Brad Adgate, *In First Four Months of 2023, CNN's Ad Revenue Has Dropped 39%*, FORBES (June 8, 2023), https://www.forbes.com/sites/bradadgate/2023/06/08/in-first-four-months-of-2023-cnns-ad-revenue-has-dropped-39/?sh=5495e0926887.

[36]     AT&T, 2021 Form 10-K (Feb. 16, 2022), at 37.

[37]     Stewart, *supra* n.13 (emphasis added).

anchor Chris Wallace and the 'Desperate Housewives' star Eva Longoria."[38]  *The New York Times* continued:

> **But that $350 million didn't show up in the CNN budget or projections and wasn't disclosed to Discovery, something AT&T's [spokesperson] Mr. Cook acknowledged. Mr. Zucker said he had warned [WarnerMedia CEO Jason] Kilar that the money had to be accounted for and disclosed. That issue was still unresolved in February [2022]**, when Mr. Zucker acknowledged that he had failed to report a consensual romantic relationship with his top lieutenant, Allison Gollust.  At the behest of Mr. Kilar, backed by Mr. Stankey, both were forced to resign.[39]

71.    In addition to hiding $350 million in CNN+ start-up costs, AT&T overstated WarnerMedia's financial projections.  Per the report in *The New York Times*:

> **When Discovery executives gained access to the company's financial records after the closing (which finally reflected the $350 million at CNN+), it would be hard to overstate Mr. Zaslav's dismay at what AT&T had left behind.**  Just 10 days later, Mr. Zaslav pulled the plug on CNN+. . . .  **Mr. Zaslav was especially upset at what he saw as projections that had overstated the value of Warner Media.**  Teams of lawyers examined the figures and questioned Warner Media's internal finance officers.[40]

Discovery took particular issue with "**the $350 million budgeted for CNN+ and accounting tactics that Discovery believed overstated revenue and understated costs at the studio.**"[41]

72.    As detailed *infra* (*see* ¶¶131-144), the Company has now publicly disclosed the numerous, specific, and material ways in which WarnerMedia's projections that AT&T provided to Discovery for purposes of the Transaction were overstated, including because WarnerMedia "largely halted" external content sales leading up to the Transaction.

---

[38]    *Id.*

[39]    *Id.* (emphasis added).

[40]    *Id.* (emphasis added).

[41]    *Id.* (emphasis added).

73.    As reported in *The New York Times*, AT&T **admitted** that it hid this information from Discovery: "AT&T acknowledged that it hadn't disclosed spending at CNN+ or at the Warner studio, or its post-Dec. 31 margins at HBO, deeming that to be highly competitive information."[42]

74.    Upon learning this information after the Transaction closed, Zaslav reacted with anger, but had to limit his response because a majority of WBD's directors had been appointed by AT&T.  As reported in *The New York Times*:

> In conversations with other media figures, **Mr. Zaslav stopped short of accusing AT&T of fraud, but did express anger**, three people familiar with the conversations said.  **Mr. Zaslav had to tread carefully, given that AT&T appointed seven of Warner Bros. Discovery's 13 board members.  [WBD spokesperson] Mr. Brown denied that Mr. Zaslav ever discussed taking the issues to AT&T's board unless AT&T offered substantial compensation to Warner Bros. Discovery.**[43]

75.    Indeed, as detailed *infra* ¶¶151-209, a majority of the WBD Demand Board is conflicted and unable to fairly assess whether to prosecute a claim against AT&T.

76.    Ultimately, the undisclosed CNN+ start-up costs were wasted, as CNN+ was shut down shortly after the Transaction.  On April 11, 2022, the same date that the post-Transaction Company's stock began trading publicly, the marketing budget for CNN+ was eliminated, and the Company announced on April 21, 2022 that CNN+ would be shut down entirely by the end of the month.  Even after CNN+ was shut down, WBD was stuck paying costs associated with it, such as the salaries of high-profile journalists like Chris Wallace and Audie Cornish.[44]

---

[42]    *Id.*

[43]    Stewart, *supra* n.13 (emphasis added).

[44]    Benjamin Mullin, *Profits Slump at CNN as Ratings Plummet*, THE NEW YORK TIMES (Aug. 2, 2022), https://www.nytimes.com/2022/08/02/business/media/cnn-profit-chris-licht.html.

77.     In light of the facts set forth herein, including that CNN+ was in development since early 2020, and that Jeff Zucker's presentation to AT&T's board in which he received approval to launch CNN+ and spend $350 million took place in June 2021, it is reasonably inferable that plans concerning CNN+ were sufficiently advanced as of the signing of the Merger Agreement (as defined below) on May 17, 2021 that such plans should have been disclosed to Discovery, and should have been accounted for in the financial information concerning WarnerMedia that AT&T provided to Discovery, as detailed below.  Further, the truth about CNN+ should have also been disclosed to Discovery in the period between the signing of the Merger Agreement and the closing of the Transaction on April 8, 2022, pursuant to AT&T's obligations under the Merger Agreement, as set forth below.

### E.     AT&T's Misleading Representations to Discovery

78.     AT&T's concealment of WarnerMedia's costs and overstatement of its revenues and income, as described above, rendered critical representations that AT&T made to Discovery in connection with the Transaction materially misleading.  These include representations relating to both WarnerMedia's historical financial information and AT&T's projections for the WarnerMedia business.

79.     AT&T made extensive representations to Discovery about the WarnerMedia business in the May 17, 2021 Agreement and Plan of Merger ("Merger Agreement") that effectuated the Transaction.

80.     The Merger Agreement includes a section entitled "Representations and Warranties of Remainco [AT&T] Relating to Spinco," the entity into which AT&T spun off WarnerMedia prior to its acquisition by Discovery in the Transaction.  In that section, the Merger Agreement states that AT&T provided to Discovery the "Spinco Financial Statements," comprised of

"unaudited combined balance sheets and the corresponding unaudited combined statements of operations as at and for the fiscal years ended December 31, 2019 and December 31, 2020 of the Spinco Business" (*i.e.*, WarnerMedia).[45]   The Spinco Financial Statements were required to be "derived from the financial data inputs into the audited financial statements of Remainco [AT&T] for the fiscal years ended December 31, 2019 and December 31, 2020, which were prepared in accordance with GAAP,"[46] and which AT&T was also required to provide to Discovery.[47]

81.     The Merger Agreement also required AT&T to provide to Discovery on a quarterly basis, from the date of the Merger Agreement through the closing of the Transaction, "Subsequent Unaudited Spinco Financial Statements," comprised of "the unaudited combined balance sheet of the Spinco Business . . . and the related unaudited combined statements of income, comprehensive income, equity and cash flows of the Spinco Business . . . together with comparable financial statements for the corresponding periods of the prior fiscal year. . . ."[48]   Additionally, the Merger Agreement required AT&T to provide to Discovery, following the end of each fiscal year, "Subsequent Audited Spinco Financial Statements," comprised of "the audited combined balance sheet of the Spinco Business as of the end of each fiscal year of Spinco and the related audited combined statements of income, comprehensive income, equity and cash flows of the Spinco Business for such fiscal year, together with comparable financial statements for the prior fiscal year. . . ."[49]

---

[45]     Merger Agreement § 6.5(a).

[46]     *Id.*

[47]     *Id.* at § 8.22(a).

[48]     *Id.* at § 8.22(b).

[49]     *Id.*

82.     In the section detailing AT&T's representations to Discovery concerning WarnerMedia, the Merger Agreement further states that the Spinco Financial Statements that AT&T provided to Discovery "were prepared in good faith"[50] and "fairly present in all material respects the financial position of the Spinco Business [*i.e.*, WarnerMedia] and the results of its operations, taken as a whole. . . ."[51] Likewise, the Merger Agreement states that AT&T represented to Discovery that the audited financial statements upon which the Spinco Financial Statements were based, the Subsequent Unaudited Spinco Financial Statements, and the Subsequent Audited Spinco Financial Statements "fairly present in all material respects the financial position of the Spinco Business and the results of its operations as of the respective dates thereof and for the respective periods covered thereby. . . ."[52] Further, the Merger Agreement makes clear that Discovery's obligations under the Merger Agreement were conditioned on the truth of these representations by AT&T.[53]

83.     The WarnerMedia financial statements provided by AT&T to Discovery are set out in the Proxy and include figures for WarnerMedia's operating revenues, operating expenses, and

---

[50]     Merger Agreement § 6.5(a).

[51]     *Id.* at § 6.5(b).

[52]     *Id.* at § 6.5(c).

[53]     *Id.* at § 9.2 (Discovery's obligation to consummate the Transaction was subject to: (a) "On the date of this Agreement and at the Closing . . . the other sections and subsections of ARTICLE V and ARTICLE VI shall be true and correct"; (b) AT&T "shall have performed in all material respects all obligations required to be performed by it under this Agreement and the other Transaction Documents at or prior to the Closing Date"; and (c) "Since the date of this Agreement, there shall not have occurred any Effect that, individually or in the aggregate, has had or would reasonably be expected to have a Spinco Material Adverse Effect."); *see also id.* at § 10.4(b) (Discovery may terminate agreement following breach by AT&T of "any representation, warranty, covenant or agreement set forth in this Agreement, or if any representation or warranty of [AT&T] shall have become untrue, in either case, such that the conditions in Section 9.2(a) or Section 9.2(b) would not be satisfied").

income.[54]  These statements include figures for 2019 and 2020, as well as figures for the first nine months of 2021, when the hidden start-up costs for CNN+ were approved and were being paid. The WarnerMedia financial statements provided by AT&T to Discovery are also set out in the Information Statement that AT&T filed, updated to provide full-year 2021 figures.[55]

84.    In light of AT&T's overstatement of revenues and understatement of costs (and thus overstatement of income, which comprises revenue minus expenses) at WarnerMedia, including AT&T's concealment of $350 million in CNN+ start-up costs, as detailed herein, the financial statements described in ¶¶79-83 above were materially false and misleading.

85.    For example, for the first nine months of 2021, AT&T represented to Discovery that WarnerMedia's net income totaled $952 million.[56]  This figure was inflated by at least $350 million (i.e., the CNN+ start-up costs that AT&T concealed).  Likewise, AT&T represented that WarnerMedia's full-year 2021 net income totaled $1.256 billion, which for the same reason was inflated by at least $350 million.  These representations were therefore materially false and misleading.

86.    The Merger Agreement also required that AT&T furnish all information concerning WarnerMedia that was necessary or reasonably requested for inclusion in the Proxy.[57]  Instead, as detailed herein, AT&T and Stankey concealed and misrepresented material information concerning WarnerMedia.

---

[54]    Proxy at 57, 150-167.

[55]    Information Statement at 48, 155, F-4 through F-8.

[56]    Proxy at 57, 157.

[57]    *Id.* at § 8.4(c); *see also* § 9.2(b) (Discovery's obligation to consummate the Transaction was subject to: "Each of Remainco and Spinco shall have performed in all material respects all obligations required to be performed by it under this Agreement and the other Transaction Documents at or prior to the Closing Date.").

87.     Such information included the financial projections for WarnerMedia that AT&T provided to Discovery, and which are summarized in the Proxy.[58]  The Proxy states that these projections were "prepared by, and are the responsibility of AT&T management,"[59] were prepared "in April 2021 by AT&T management,"[60] and were prepared and provided to Discovery "prior to the announcement" of the Transaction for purposes of "reviewing" the proposed Transaction.[61] The Proxy adds: "The WarnerMedia Projections in this [Proxy] are provided in this [Proxy] only because AT&T made them available to Discovery in connection with the process of reviewing the Transactions."[62]

88.     AT&T's financial projections for WarnerMedia in the Proxy included revenue, adjusted EBITDA, and total pre-tax cash flow figures, for 2021-2025, together with historical figures for 2019 and 2020,[63] as well as Discovery's adjustments to those projections that "resulted in lower overall adjusted margins."[64]  These figures also appear in the Information Statement that AT&T filed.[65]  The 2021 and 2022 projections, at a minimum, were materially inflated due to AT&T's concealment of CNN+'s start-up costs, as those costs were approved in 2021 and were presumably being paid through the launch of CNN+ in March 2022.

89.     In light of AT&T's overstatement of revenues and income and understatement of costs at WarnerMedia, including AT&T's concealment of $350 million in CNN+ start-up costs,

---

[58]     Proxy at 218-220.

[59]     *Id.* at 219.

[60]     *Id.*

[61]     *Id.* at 218.

[62]     *Id.* at 220.

[63]     *Id.* at 220.

[64]     *Id.* at 213-214.

[65]     Information Statement at 197.

and AT&T's "questionable accounting tactics to inflate the projections on which the value of the Warner[Media] assets was based," as detailed herein, the projections described above in ¶¶86-88 were materially false and misleading.

90.     For example, AT&T represented to Discovery that it projected WarnerMedia's 2021 Adjusted EBITDA to be $7.2 billion.[66]  Following AT&T's representation, Discovery's Adjusted EBITDA projection for WarnerMedia for 2021 was also $7.2 billion.[67]  In other words, Discovery did not make any downward adjustment to AT&T's Adjusted EBITDA projection for WarnerMedia for 2021.

91.     In light of AT&T's overstatement of revenues and income and understatement of costs at WarnerMedia, including AT&T's concealment of $350 million in CNN+ start-up costs, and AT&T's "questionable accounting tactics to inflate the projections on which the value of the Warner[Media] assets was based," as detailed herein, the projections described above in ¶90 were materially false and misleading.

92.     In addition, AT&T represented to Discovery that it projected WarnerMedia's 2022 Adjusted EBITDA to be $6.8 billion.[68]  Discovery's adjusted EBITDA projection for WarnerMedia for 2022, which adjusted the $6.8 billion figure that AT&T provided to account for certain differing industry and business planning assumptions, was $6.2 billion.[69]

---

[66]     Proxy at 220.  "Adjusted EBITDA is defined as operating income plus (1) employee share-based compensation, (2) depreciation and amortization, and (3) certain inter-segment eliminations."  *Id.; see also* Information Statement at 197 (includes same $7.2 billion figure).

[67]     Proxy at 214; Information Statement at 191.

[68]     Proxy at 220; Information Statement at 197 (includes same $6.8 billion figure).

[69]     Proxy at 214; Information Statement at 191.

93.    The projections set out in ¶92 above were false and misleading due to AT&T's overstatement of revenues and income and understatement of costs at WarnerMedia, including AT&T's concealment of $350 million in CNN+ start-up costs, and AT&T's "questionable accounting tactics to inflate the projections on which the value of the Warner[Media] assets was based."

94.    Moreover, the projections described in ¶¶86-88, 90, and 92 above were also false and misleading because, as detailed below (*see infra* ¶¶131-144), "certain legacy WarnerMedia budget projections that were made available to [Discovery] prior to closing" were overstated, resulting in WBD "starting from a less favorable position compared to [Discovery's] expectations" and announcing on August 4, 2022 that it was revising downward its EBITDA projections for 2022 by $2 billion.   Thus, the $6.8 billion Adjusted EBITDA projection that AT&T provided to Discovery for WarnerMedia for 2022 was inflated by at least $2 billion.   Likewise, because Discovery's revised $6.2 billion Adjusted EBITDA projection for WarnerMedia for 2022 was based on the projection that AT&T provided to Discovery, that $6.2 billion figure was also inflated by at least $2 billion.

95.    AT&T also represented to Discovery in the Merger Agreement that, "[s]ince December 31, 2020 and through the date of this Agreement, . . . the Spinco Business [*i.e.*, WarnerMedia] has been conducted in the Ordinary Course in all material respects. . . ."[70]   In addition, AT&T covenanted and agreed in the Merger Agreement that, from the signing of the

---

[70]    Merger Agreement § 6.6(b).  "'Ordinary Course' means, with respect to an action taken by any Person, that such action is consistent with the ordinary course of business and past practices of such Person, excluding any deviations therefrom due to action taken consistent with trends in the industry in which the Spinco Business operates or COVID-19 Changes."  *Id.* at Annex A-7.

Merger Agreement through the closing of the Transaction, it "shall use its reasonable best efforts . . . to conduct the Spinco Business in the Ordinary Course. . . ."[71]

96.     The representations set out in ¶95 above were false and misleading because, as detailed below, WarnerMedia "largely halted" its external content sales prior to the closing of the Transaction. This decision to hoard content for WarnerMedia's streaming service HBO Max represented a substantial change in WarnerMedia's business model, which had previously focused on selling content to external distributors (*see infra* ¶136). Likewise, AT&T's undisclosed decision to launch CNN+ with $350 million of start-up costs was outside the ordinary course, constituting "the network's most important venture since its founding in 1980." *See supra* ¶67; *see also supra* n.35 (WarnerMedia CEO upon the launch of CNN+: "It would be hard to overstate how important this moment is for CNN.").

### F.     Discovery Relied Upon AT&T's Misleading Representations

97.     Discovery relied upon AT&T's misleading representations concerning WarnerMedia in deciding to enter into the Transaction, which included Discovery's acquisition of all the stock of Spinco, the entity into which AT&T spun-off its WarnerMedia assets.

98.     AT&T's representations were the basis of Discovery's due diligence review and assessment of the Transaction. For example, the Proxy explains that AT&T provided Discovery with access to a virtual data room to facilitate Discovery's due diligence concerning WarnerMedia.[72]

99.     There is no indication that the projected revenues and earnings associated with CNN+ were ever removed from the projections Discovery and its advisors used to value

---

[71]     *Id.* at § 8.1(a).

[72]     Proxy at 179.

WarnerMedia, and it is reasonable to infer that such revenues and earnings were included in those projections.  As discussed above at ¶90, Discovery did not adjust AT&T's $7.2 billion earnings projection for WarnerMedia for 2021.  Moreover, the April 23, 2021 presentation to the Executive Committee of Discovery's board asserted that "Discovery's Experiences in Europe Illustrate the Value of Live News and Sports" and highlighted that Turner, the WarnerMedia business that included CNN, was "Exploring [a] Separate Subscription Service for CNN" (*i.e.*, CNN+).[73]

100.    The Merger Agreement makes clear that Discovery was to rely on representations made by AT&T in that agreement and documents and information delivered by AT&T pursuant to that agreement (such as the Subsequent Unaudited Spinco Financial Statements).[74]

101.    The Proxy also explains that, in analyzing the fairness of the Transaction, Discovery's financial advisors, Allen & Co. and J.P. Morgan, relied upon the financial information for WarnerMedia that AT&T provided.  For example, for purposes of conducting a selected public companies valuation analysis, "Discovery's financial advisors performed a sum-of-the-parts

---

[73]    Del. Ch. Compl. ¶111.

[74]    Merger Agreement § 11.7(b) ("Each Party . . .  acknowledges and agrees that, except for the representations and warranties expressly set forth in this Agreement or any instrument or other document delivered pursuant to this Agreement, (i) no Party has made or is making any other representations, warranties, statements, information or inducements, (ii) no Party has relied on or is relying on any other representations, warranties, statements, information or inducements and (iii) each Party hereby disclaims reliance on any other representations, warranties, statements, information or inducements, oral or written, express or implied, or as to the accuracy or completeness of any statements or other information, made by, or made available by, itself or any of its Representatives, in each case with respect to, or in connection with, the negotiation, execution or delivery of this Agreement, any instrument or other document delivered pursuant to this Agreement or the Transactions, and notwithstanding the distribution, disclosure or other delivery to the other or the other's Representatives of any documentation or other information with respect to any one or more of the foregoing, and waives any claims or causes of action relating thereto, other than those for intentional fraud in connection with, arising out of or otherwise related to the express representations and warranties set forth in this Agreement or any instrument or other document delivered pursuant to this Agreement.").

analysis of WarnerMedia based on financial forecasts and estimates of AT&T management as adjusted per the management of Discovery."[75]   Likewise, the Proxy states that "Discovery's financial advisors performed separate discounted cash flow analyses of WarnerMedia . . . based on financial forecasts and estimates relating to WarnerMedia prepared by the management of AT&T as adjusted and extended per the management of Discovery."[76]   Additionally, the Information Statement indicates with respect to Allen & Co.:

> **Allen & Company relied upon and assumed**, with Discovery's consent and without independent verification, the accuracy and completeness of **all of the financial, legal, regulatory, tax, accounting and other information available to Allen & Company from public sources, provided to or discussed with Allen & Company by the managements and other representatives of Discovery and AT&T** or otherwise reviewed by Allen & Company. **With respect to the financial forecasts, estimates and other financial and operating data (as adjusted and extended, in the case of WarnerMedia, per the management of Discovery)** and the potential net synergies from the Merger that Allen & Company was directed to utilize for purposes of its analyses, **Allen & Company was advised by the respective managements of Discovery and AT&T and Allen & Company assumed, at Discovery's direction, that such financial forecasts, estimates and other financial and operating data were reasonably prepared in good faith on bases reflecting the best currently available estimates and judgments of such managements, as applicable, as to, and were a reasonable basis upon which to evaluate, the future financial and operating performance of WarnerMedia**. . . .[77]

102.    Likewise, the Information Statement indicates with respect to J.P. Morgan:

> **J.P. Morgan relied upon and assumed the accuracy and completeness of all information that was publicly available or was furnished to or discussed with J.P. Morgan by Discovery and AT&T** or otherwise reviewed by or for J.P. Morgan. J.P. Morgan did not independently verify (and did not assume

---

[75]    Proxy at 208; *see also id.* at 209 ("Discovery's financial advisors also conducted a sum-of-the-parts selected public companies analysis of WarnerMedia based on financial forecasts and estimates of AT&T management as adjusted per the management of Discovery relating to individual segments of WarnerMedia (considered by J.P. Morgan for informational reference only and not considered part of the material financial analyses for its opinion). . . .").

[76]    Proxy at 210.

[77]    Information Statement at 175 (emphasis added).

responsibility or liability for independently verifying) any such information or its accuracy or completeness.

103.    Further illustrating Discovery's reliance, Zaslav was extremely upset upon learning

that AT&T withheld material financial information concerning WarnerMedia's business:

> **When Discovery executives gained access to the company's financial records after the closing (which finally reflected the $350 million at CNN+), it would be hard to overstate Mr. Zaslav's dismay at what AT&T had left behind.**  Just 10 days later, Mr. Zaslav pulled the plug on CNN+. . . . **Mr. Zaslav was especially upset at what he saw as projections that had overstated the value of Warner Media.**  Teams of lawyers examined the figures and questioned Warner Media's internal finance officers.[78]

104.    As *The New York Times* further reported:

> In conversations with other media figures, **Mr. Zaslav stopped short of accusing AT&T of fraud, but did express anger**, three people familiar with the conversations said.  **Mr. Zaslav had to tread carefully, given that AT&T appointed seven of Warner Bros. Discovery's 13 board members.  [WBD spokesperson] Mr. Brown denied that Mr. Zaslav ever discussed taking the issues to AT&T's board unless AT&T offered substantial compensation to Warner Bros. Discovery**.[79]

## G.    AT&T and Stankey Acted With the Requisite Scienter

105.    AT&T misled Discovery concerning the WarnerMedia business with actual

knowledge of the truth, or at a minimum with reckless disregard for the truth.

106.    AT&T was highly incentivized to sell WarnerMedia in order to relieve AT&T's

enormous debt burden and retreat from AT&T's failed media strategy (*see supra* ¶¶31-44).

107.    AT&T, through Stankey and its other executives, acted on that incentive.  As

discussed above (¶¶69-73), AT&T has acknowledged that it intentionally concealed $350 million

in CNN+ start-up costs from Discovery, despite internal warnings that these costs needed to be

---

[78]    Stewart, *supra* n.13 (emphasis added).

[79]    *Id.* (emphasis added).

disclosed.  Moreover, Discovery came to believe that AT&T engaged in "accounting tactics to inflate the [WarnerMedia] projections," and which "overstated revenue and understated costs" for WarnerMedia.  As a result, AT&T dramatically overstated WarnerMedia's financial position, which WBD has now acknowledged (*see infra* ¶¶131-144).

108.    In addition, the undisclosed decision to "largely halt[]" external content sales at WarnerMedia, which rendered AT&T's earnings projections for WarnerMedia misleading, was a corporate strategic decision that could not have been made without the knowledge of AT&T and its top executives, including Stankey.

109.    Stankey, as AT&T's CEO and lead negotiator in discussions with Discovery, had actual knowledge of the facts that were concealed from Discovery, or at a minimum acted with reckless disregard for the truth in that he failed to ascertain and to disclose such facts, even though such facts were available to him.

110.    Further, as CEO of WarnerMedia from June 2018 through April 2020, Stankey had actual knowledge about WarnerMedia's budgets, plans, and prospects, including the facts that AT&T withheld from Discovery.

111.    As the CEO of AT&T, Stankey was incentivized to maximize the price that Discovery paid AT&T for WarnerMedia.  Stankey was also personally incentivized to maximize the amount that Discovery paid, both because of his ownership of AT&T stock and because his compensation was structured to reward him based on AT&T's financial and strategic performance metrics.

112.    Stankey owned a substantial amount of AT&T stock throughout the relevant period.  As of December 31, 2020, when AT&T's stock price closed at $21.72/share, Stankey owned

425,253 shares of AT&T stock, and 257,189 non-voting vested stock units.[80]  As of December 31, 2021, when AT&T's stock price closed at $18.58/share, Stankey owned 535,910 shares of AT&T stock, 83,114 restricted stock units in AT&T stock distributable within 60 days, 441,867 shared voting and investment power shares, and 290,383 non-voting vested stock units.[81]  As of December 31, 2022, when AT&T's stock price was $18.41/share, Stankey owned 676,451 shares of AT&T stock, 116,195 restricted stock units in AT&T stock distributable within 60 days, 441,867 shared voting and investment power shares, and 548,021 non-voting vested stock units.[82]

113.    Stankey's compensation was structured to reward him for improving AT&T's stock price and financial metrics and furthering AT&T's strategic goals, all of which incentivized him to cause Discovery to overpay for WarnerMedia.

114.    In 2021, 89% of Stankey's target compensation from AT&T was "at-risk," meaning that it was based on AT&T's performance, with the remainder consisting of his $2.4 million base salary.[83]  Stankey's at-risk pay included compensation based on AT&T's short-term performance, assessed based on AT&T's earnings per share, free cash flow, and "[k]ey strategic and transformation initiatives and team effectiveness," including "[d]emonstrating leadership in driving transformation across the organization consistent with the Company's multi-year transformation initiative."[84]  This strategic component accounted for 20% of Stankey's short-term

---

[80]    AT&T, 2021 Notice of Annual Meeting of Stockholders and Proxy Statement (Mar. 22, 2022), at 31.

[81]    *Id*.

[82]    AT&T, 2023 Notice of Annual Meeting of Stockholders and Proxy Statement (Apr. 3, 2023), at 26.

[83]    AT&T, 2022 Notice of Annual Meeting of Stockholders and Proxy Statement (Mar. 22, 2022), at 53.

[84]    *Id.* at 53-54

target performance pay.[85]  In 2021, AT&T compensated Stankey based on a 100% payout of this strategic metric, in part because AT&T was able to "reposition" WarnerMedia with the "right partner[] to optimize returns"—*i.e.*, Discovery.[86]  Stankey's at-risk compensation was also based on long-term performance, in the form of "performance shares" equal in value to AT&T common stock and paid 66% in cash and 34% in common stock at the end of a three-year period, and restricted stock units paid entirely in stock at the end of a four-year period.[87]

115.    As a result of these calculations, AT&T paid Stankey total compensation in 2021 of $24,820,879, including $13,420,341 in stock awards.[88]  Stankey realized $15,350,140 in compensation in 2021, including $6,888,000 based on AT&T's short-term performance; $4,921,664 based on performance shares, of which 66% was paid in cash and 34% in AT&T stock; and 47,271 shares paid based on restricted stock units, valued at $1,140,177.[89]  In addition, with respect to stock awards, Stankey received performance shares with a target value of $10,125,000, and restricted stock units with a target value of $3,375,000.[90]

116.    Then, in 2022, Stankey was paid based on the same overall structure as in 2021, with operating income replacing earnings per share as a short-term performance metric, and earnings per share instead being used as a long-term measure.[91]  As in 2021, 89% of Stankey's target compensation from AT&T was "at-risk" in 2022, with the remainder consisting of his $2.4

---

[85]    *Id.* (short-term performance pay target of $5.6 million).

[86]    *Id.* at 57.

[87]    *Id.* at 59.

[88]    *Id.* at 75.

[89]    *Id.* at 63.

[90]    *Id.* at 68.

[91]    AT&T, 2023 Notice of Annual Meeting of Stockholders and Proxy Statement (Apr. 3, 2023), at 45.

million base salary.[92]  Further, as in 2021, 20% of Stankey's short-term performance pay was based on a strategic metric, including the following goal: "Demonstrating leadership in driving transformation across the organization with the company's multi-year transformation initiative that builds on our existing strong customer service."[93]  AT&T awarded Stankey a 115% payout on the strategic metric in 2022, in part because AT&T "[e]xecuted a complex corporate restructuring that closed strategic transactions totaling more than $41 billion and restructured our operations to provide additional balance sheet flexibility, reducing total debt by nearly $40 billion and net debt by about $24 billion."[94]  That 115% payout, based in substantial part on the Transaction, was worth approximately $1,288,000 to Stankey.[95]

117.    In total, AT&T paid Stankey compensation in 2022 of $22,915,526, including $13,499,988 in stock awards.[96]  Those stock awards consisted of performance shares with a target value of $10,125,000, and restricted stock units with a target value of $3,375,000.[97]

118.    While AT&T stockholders generally received 0.24 shares of WBD stock for every share of AT&T stock they owned as part of the Transaction, Stankey and other executives who received equity compensation from AT&T did not receive WBD shares.  Instead, to maintain the overall value of their equity compensation, Stankey and other AT&T equity compensation recipients received an increased number of AT&T shares, amounting to an approximate 22%

---

[92]    *Id.*

[93]    *Id.* at 46.

[94]    *Id.* at 48.

[95]    ($5.6 million in target pay for short-term performance) x (20% weighting for strategic metric) x (115% payout) = $1.288 million.

[96]    AT&T, 2023 Notice of Annual Meeting of Stockholders and Proxy Statement (Apr. 3, 2023), at 60.

[97]    *Id.* at 53.

increase.[98]   This arrangement further heightened Stankey's incentive to cause Discovery to overpay AT&T for WarnerMedia.

## H.    The Transaction Is Finalized and Approved

119.    On May 16, 2021, the Discovery board met to discuss the Transaction, including the Compensation Committee's recommendation to approve Zaslav's New Employment Agreement, for the final time prior to the announcement of the Transaction.  The entire Discovery senior management team was present at the meeting.[99]   Bruce Campbell, Discovery's Chief Development, Distribution & Legal Officer, gave a presentation that summarized the terms and final agreements.  The board heard a presentation by representatives of Debevoise & Plimpton LLP, Discovery's legal advisor, which summarized the terms of Zaslav's New Employment Agreement and recommended the agreement for board approval.

120.    The board also heard a "Financial Considerations" presentation by Wiedenfels concerning the "long-term forecasts and related assumptions for both the Company and [WarnerMedia]."[100]   Given the massive $43 billion in debt the Company was anticipating assuming, Wiedenfels focused on reviewing the terms of the Company's financing as well as a chart that depicted "strategies that would be employed to reduce leverage post-closing."[101]

121.    The meeting concluded with the board receiving a joint fairness presentation from J.P. Morgan and Allen & Co.  Both firms concluded that "the Exchange Ratio[]is fair, from a financial point of view to the Corporation."[102]

---

[98]     *Id.* at 26.

[99]     Del. Ch. Comp. ¶188.

[100]    *Id*. at ¶190.

[101]    *Id.*

[102]    *Id.* at ¶191.

122.    At the end of the May 16, 2021 meeting, the board approved Discovery's entry into the merger agreement whereby Discovery stockholders would own 29% of WBD's common equity, with AT&T stockholders owning 71% on a fully diluted basis.  Discovery's board further agreed to issue $43 billion in cash and debt securities to AT&T.

123.    As noted by industry analysts Wells Fargo and MKM Partners, WBD's leverage after the Transaction was expected to be 5x, a 66%-42.8% increase to Discovery's historical leverage of 3x-3.5x, respectively.

124.    The Transaction was announced on May 17, 2021, the day after it was approved by Discovery's board.

125.    In the Transaction, Discovery acquired AT&T's WarnerMedia business, which AT&T spun off as part of the Transaction.  Discovery was the surviving corporation and was renamed "Warner Bros. Discovery."  The structure of the Transaction involved five steps:

- First, AT&T transferred its WarnerMedia business to a wholly owned subsidiary (Magallanes, Inc., or "Spinco").

- Second, Spinco distributed cash and debt instruments to AT&T totaling approximately $30 billion and $13 billion, respectively, for a total of $43 billion, subject to adjustment.  This total was adjusted to $40.4 billion by the time the Transaction closed.[103]

- Third, AT&T distributed to its stockholders all of the shares of Spinco.

- Fourth, Discovery amended its certificate of incorporation to change its name to Warner Bros. Discovery, Inc. and to convert each share of Discovery's Series A, B, and C common stock, as well as its Series A-1 and C-1 preferred stock, into Warner Bros. Discovery common stock.  Specifically, each share of Discovery's Series A, B, and C common stock was converted into one share of Warner Bros. Discovery stock, each share of Discovery's Series A-1 preferred stock was converted into 13.11346315 shares of Warner Bros. Discovery common stock, and each share of Discovery's Series C-1 preferred stock was converted into 19.3648 shares of Warner Bros. Discovery common stock.

---

[103]    *See Discovery and AT&T Close WarnerMedia Transaction*, AT&T.COM (Apr. 8, 2022), https://about.att.com/story/2022/close-warnermedia-transaction.html.

- Fifth, a wholly owned subsidiary of WBD merged with and into Spinco, with WBD acquiring all the common stock of Spinco (except for shares of Spinco common stock held by Spinco or its subsidiaries, which were canceled), and Spinco surviving as a wholly owned subsidiary of Warner Bros. Discovery.  In exchange, each share of common stock of Spinco was converted into the right to receive 0.241917 shares of WBD common stock.

126.    As a result of the Transaction, Discovery's existing stockholders received 29% of the outstanding shares of the post-Transaction Company, AT&T stockholders received 71% of the outstanding shares of the post-Transaction Company, and the post-Transaction Company was indebted in the amount of $40.4 billion to fund the distribution of cash and debt instruments to AT&T (separate and apart from Discovery's pre-existing $15 billion in debt).

127.    As part of the Transaction, Zaslav received a compensation package pursuant to the New Employment Agreement that, when it was approved by Discovery's board, was valued at more than half a billion dollars through 2027.

128.    On February 4, 2022, Discovery filed the final amended version of the Proxy, which included the materially misleading financial information and projections for WarnerMedia that AT&T had provided.  Pursuant to that Proxy, the Transaction was approved by Discovery's stockholders (apart from its Class C common stockholders, who were not given a vote) on March 11, 2022, and closed on April 8, 2022.

129.    Analysts reacted to the announcement of the Transaction by noting that it appeared to benefit AT&T in particular.  For example, an analyst at Cowen issued an equity research report on May 16, 2021 in light of rumors of the pending deal, and concluded that the Transaction was "positive" for only one participant: AT&T, which would be able to unwind its prior, misguided vertical integration strategy, and de-lever following a wireless spectrum auction to which it had committed $23 billion.

130.    Similarly, a May 17, 2021 J.P. Morgan analyst report noted the especially favorable terms the Transaction offered AT&T stockholders: *"Deal provides AT&T shareholders with $102b in value.  Based on the current share price of Discovery, AT&T shareholders will receive $60b of equity value of the new media company and $43b in cash for total deal value of $102b vs the $85b purchase price of Time Warner, which was announced in 2016 but closed in June 2018."*[104]

I.    **WarnerMedia's Overvaluation is Revealed**

131.    The weakness of the WarnerMedia business came to public light after the Transaction closed on April 8, 2022.  The first cracks began to show on April 21, 2022, when AT&T reported WarnerMedia's results for the first quarter of 2022.  In a press release before the start of trading, AT&T reported that WarnerMedia's operating income for the quarter had fallen to $1.3 billion, down 32.7% year-over-year, "as a result of continued investments in HBO Max as well as in the launch of CNN+ at the end of the quarter. . . ."  The same day, the Company announced that it was shutting down CNN+.  WBD's stock price declined from $23.01 per share at the close of trading on April 20, 2022, to $21.45 per share at the close of trading on April 21, 2022, a decline of 6.8%.

132.    WBD executives addressed the decline in WarnerMedia's operating results in an April 26, 2022 conference call before trading opened.  CFO Wiedenfels observed that WarnerMedia's results were disappointing, while Discovery's had been strong: "Q1 operating profit and cash flow for WarnerMedia were clearly below my expectations.  And given that Q1 performance and previously unplanned projects in flight, I currently estimate the WarnerMedia

---

[104]    J.P. Morgan, *Suspending Rating & Price Target; AT&T Announces WM Combination with Discovery, Plans Dividend Reduction & Capex Raise* (May 17, 2021).

part of our profit baseline for 2022 will be around $500 million lower than what I had anticipated, however, with a positive offset of a couple of hundred million dollars on the Discovery side of the combined company."[105]  He added that there were "certain investment initiatives underway in plain sight" at WarnerMedia "that I don't think have attractive enough return profiles," with CNN+ being "Exhibit A."[106]  Because WarnerMedia had made "a lot of chunky investments that are lacking what I would view as a solid analytical financial foundation and ... [return on investment] hurdles that I would like to see for major investments," Wiedenfels concluded that "2022 very much looks a little messier than probably what I had hoped for."[107]  In addition, Zaslav commented: "There's meaningful churn on HBO Max, much higher than the churn that we have seen [at Discovery+]."[108]  WBD's stock price declined from $21.50 per share at the close of trading on April 25, 2022, to $19.83 per share at the close of trading on April 26, 2022, a decline of 7.8%.

133.    Later in 2022, Discovery acknowledged that the WarnerMedia projections that AT&T provided in connection with the Transaction were overstated.  In the Company's second quarter 2022 earnings call on August 4, 2022, which was held after trading hours, Discovery slashed its earnings guidance to well below Wall Street consensus.[109]  For example, the Company lowered its 2023 adjusted EBITDA guidance to $12 billion,[110] down from its prior guidance of $14 billion when the Transaction was announced.[111]  This revised figure was far below the earnings

---

[105]    Warner Bros. Discovery, Inc., Q1 2022 Earnings Call Transcript (Apr. 26, 2022), at 6.

[106]    *Id.*

[107]    *Id.* at 8.

[108]    *Id.* at 12.

[109]    *See* Kannan Venkateshwar, *Kitchen sink quarter; but will it be the last one?*, BARCLAYS (Aug. 5, 2022).

[110]    Warner Bros. Discovery, Inc., Q2 2022 Earnings Call Transcript (Aug. 4, 2022), at 11.

[111]    AT&T and Discovery, Joint Conference Call Transcript (May 17, 2021), at 4-5.

projections used for the purposes of J.P. Morgan's and Allen & Co.'s financial analyses that formed the basis of their fairness opinions for the Transaction.   Wiedenfels asserted on the call that those disappointing results were "driven by the legacy WarnerMedia businesses with significant cost increases across all segments."[112]

134.    Wiedenfels then disclosed that WBD had "now had an opportunity to fully assess legacy WarnerMedia's financials post closing," and acknowledged that WBD was "**starting from a less favorable position compared to our expectations**."   Wiedenfels revealed: "**Having concluded this process, we determined that certain legacy WarnerMedia budget projections that were made available to us prior to closing, varied from what we now view as legacy WarnerMedia's budget baseline post closing**.   On taking a deep dive in pressure testing, what we found, our assessment has resulted in lower EBITDA projections," including an approximately $2 billion lower EBITDA projection for 2022.[113]

135.    According to Wiedenfels, WarnerMedia's earnings projections that had been provided to Discovery before the Transaction were overstated with respect to: (1) external content sales that WarnerMedia had "largely halted"; (2) HBO Max's limited business-to-business distribution model; (3) over-investment in kids and animation content "without an adequate investment case"; (4) over-investment in direct-to-HBO Max films, for which WBD "did not find sufficient support"; (5) "significant incremental and loss-making content investments for the Turner networks" (which include CNN, TNT, and TBS); and (6) corporate costs for WarnerMedia that were transferred from AT&T to WBD.[114]   In response to these findings, WBD shut down

---

[112]    Warner Bros. Discovery, Inc., Q2 2022 Earnings Call Transcript (Aug. 4, 2022), at 9.

[113]    *Id.* at 9-10 (emphasis added).

[114]    *Id.* at 10.

CNN+ and attempted to restructure the content creation and distribution approach it inherited from WarnerMedia.[115]

136.    For years, licensing content to external platforms—including cable television networks as well as streaming services such as Netflix and Hulu—had been a profitable mainstay of WarnerMedia's business.[116]  The fact that WarnerMedia had "largely halted" external content sales prior to the Transaction came as a shock to Discovery.  Indeed, before the close of the Transaction, Zaslav had touted WarnerMedia's role as a preeminent content provider to numerous distribution platforms, noting in a February 24, 2022 earnings call (emphasis added):

> **As one of the leading content arms dealers in the industry, Warner Bros. television is formidable**, and as a company, we will also be uniquely positioned to better serve advertisers and distributors globally. Said another way, we can monetize across any number of different cash registers. **Consider that Warner Bros. television has over 100 active series being sold to over 20 platforms and outlets. It's a content maker and content owner generating significant revenue, free cash flow and most importantly, optionality. There's not a lot of content makers out there, certainly not of the scale and quality that Warner Bros. television is in the marketplace today** and particularly at a time when the demand for quality television production has never been stronger, an important distinction when considering the asset mix of this company, a very real, very balanced and very complete company.

137.    By contrast, after learning the truth, Wiedenfels revealed on the August 4, 2022 call: "As part of a corporate initiative to prioritize HBO Max growth globally, new content licensing deals to third parties were largely halted and content was, in general, made exclusive to HBO Max."

---

[115]    *Id.*

[116]    *See, e.g.*, Alex Weprin, *David Zaslav's Strategy Shift: Licensing Out Warners' IP Treasure*, THE HOLLYWOOD REPORTER (Sept. 16, 2022), https://www.hollywoodreporter.com/business/business-news/david-zaslavs-strategy-shift-licensing-out-warners-ip-treasure-1235222408 ("Of course, Warner Bros. is no stranger to licensing content, with its TV division having long been one of the most aggressive about selling shows to other networks and platforms," whereas WarnerMedia "under Jason Kilar and AT&T withheld as much content as possible for HBO Max to rapidly grow its subscriber base.").

138.    This undisclosed decision to largely cease licensing WarnerMedia content to third-party distributors before the Transaction was highly significant, as content-licensing revenues constituted approximately 38% of WarnerMedia's total revenues in 2021.[117]

139.    As a result of these disclosures, WBD's stock price declined from $17.48 per share at the close of trading on August 4, 2022, to $14.59 per share at the close of trading on August 5, 2022, a decline of 16.5%.

140.    Research analysts took notice of these disclosures.  For example, in an August 5, 2022 equity research report, Barclays highlighted that the Company had slashed its free cash flow guidance to approximately $6 billion for 2023, far below prior guidance of $8 billion.  Barclays observed that this decrease was "likely warranted" and that "the company appears to have misjudged the base earnings of the acquired asset [*i.e.*, WarnerMedia] significantly (**which is pretty surprising for a deal of this scale to say the least**)."  Barclays concluded that "this also means that **the company overpaid significantly for the acquired assets**."[118]

141.    Likewise, in an August 4, 2022 equity research report, a Wolfe Research analyst reacted to WBD's disclosures by exclaiming: "We've been concerned about hidden/surprise costs of buying Warner from AT&T, but the magnitude of today's reset was 'WOW'!"[119]

---

[117]    AT&T, 2021 Form 10-K (Feb. 16, 2022), at 37 ("Content and other" revenues of $13.514 billion, compared to total revenues of $35.623 billion).

[118]    Venkateshwar, *supra* n.110 (emphasis added); *see also* Douglas Mitchelson et al., *Warner Bros. Discovery 2Q'22 Wrap*, CREDIT SUISSE (Aug. 5, 2022) ("[T]he merger with WarnerMedia is off to a messy start, with [WarnerMedia] operations $2B short of plan for 2022[.]").

[119]    Peter Supino, *WBD 2Q'22: Miss & Lower – Today's Discovery…Massive Reset Needed*, WOLFE RESEARCH (Aug. 4, 2022) (discussing WBD's disclosure of "1) foregone revenue as the previous regime focused heavily on HBO Max at the expense of TV and film licensing, with de-emphasis of B2B [*i.e.*, business-to-business] distribution (*i.e.*, Amazon Prime); 2) content and project investments with poor ROI [*i.e.*, return on investment] incl. kids content, CNN+, Turner originals, and exclusive HBO Max film releases; and 3) corporate expenses that were higher than previous projections").

142.    Further demonstrating the severe deficiencies in the WarnerMedia assets, the Company announced on October 24, 2022 that it expected to incur as much as $4.3 billion in pretax restructuring charges through 2024, including between $2 billion and $2.5 billion in writing down the value of content and killing off projects in development.[120]

143.    At a November 15, 2022 conference, Zaslav observed once again that the WarnerMedia assets were less valuable than Discovery believed at the time of the Transaction and that these problems came as a surprise to Discovery:

> **Look, it was much more challenging than we thought.  You open the closet, stuff fell out. And people coming in, going in, I don't understand what's going on here. We're spending a lot of money here. This doesn't look like we were getting a return.  So we were finding all kinds of stuff.  And the leadership team at the beginning, it was a little bit like disconcerting,** but I view it as the opposite.  Anytime we can see something and say, we can do that better or that didn't make sense, let's stop doing that.  That's an opportunity.  **So it's messier than we thought.  It's much worse than we thought. . . .  [T]here was a lot that was unexpectedly worse than we thought.**  And so, to me, I don't want to buy a company that's really well run. I don't want to buy that company. It's hard to make it better.  So every day that we come in, and we open a closet, something comes out, I say, that's great.  What was that doing in the closet, take it out, throw it away, we'll take it out and put it on the shelf where people could see it and they could buy it.[121]

144.    Zaslav also acknowledged at the same conference that "**the economics of [the WarnerMedia] business are less than we thought, and it's a mess, it's much messier than we thought**. . . ."[122]  In addition, Zaslav noted: "In 2019, HBO spent $2.5 billion on content and made

---

[120]    Warner Bros. Discovery, Inc., Form 8-K (Oct. 24. 2022); Joe Flint, *Warner Bros. Discovery Flags Up to $4.3 Billion in Restructuring Costs*, WALL STREET JOURNAL (Oct. 24, 2022),      https://www.wsj.com/articles/warner-bros-discovery-flags-up-to-4-3-billion-in-restructuring-costs-11666654002?mod=article_inline.

[121]    *Warner Bros. Discovery, Inc., RBC Capital Markets Technology, Internet, Media and Telecommunications Conference 2022 Transcript* (Nov. 15, 2022), at 12-13 (emphasis added).

[122]    *Id.* at 7 (emphasis added).

$2.5 billion.  Last year [in 2021], HBO spent almost $7 billion on content and lost $3 billion.  I don't know if I've ever seen anything like that."[123]

145.    The Transaction also involved the Company taking on an enormous debt burden. As detailed above (¶¶65, 125-126), WBD assumed $40.4 billion of debt to fund an enormous payout to AT&T as part of the Transaction.  This debt assumption was on top of the approximately $15 billion in debt that was already on Discovery's balance sheet.  As *The New York Times* reported, the Transaction resulted in WBD being "shackled with a colossal debt load," and "Wall Street's perception of the company . . . was that it was overburdened with debt and not primed for growth."[124]

## DERIVATIVE ALLEGATIONS

146.    Plaintiff brings this action on behalf of Warner Bros. Discovery (f/k/a Discovery, Inc.) to redress injuries suffered by the Company as a result of Defendants' violations of federal securities laws.

147.    Plaintiff is currently a beneficial owner of WBD common stock and a former owner of Discovery common stock.  Plaintiff owned Discovery common stock continuously during the relevant time period until April 11, 2022, when Nasdaq "suspended trading of such series of Discovery stock . . . prior to the opening of trading on April 11, 2022," and Plaintiff received WBD stock in exchange.[125]  Plaintiff has held WBD common stock continuously since that time.

---

[123]    *Id.* at 12.  WBD later clarified that Zaslav meant that HBO's earnings had declined by $3 billion since 2019.  Stewart, *supra* n.13.

[124]    Jonathan Mahler et al., *How David Zaslav Blew Up Hollywood*, THE NEW YORK TIMES (Nov. 15, 2023), https://www.nytimes.com/2023/11/15/magazine/david-zaslav-warner-media-discovery.html.

[125]    Warner Bros. Discovery, Inc., Form 8-K (Apr. 12, 2022), at Item 3.01.

148.    Discovery is the surviving corporation in the Transaction, which amended the charter to rename the Company "Warner Bros. Discovery" and reclassify its stock into a single class.  Plaintiff has been a stockholder of the Company continuously from before the Transaction occurred through the present and therefore has standing to pursue derivative claims on behalf of WBD.

149.    In addition, the Proxy states that the Transaction qualifies as a reorganization under the IRS Code, 26 U.S. § 368(a).[126]   Under the "mere reorganization" doctrine, Plaintiff has standing to pursue derivative claims on behalf of the Company.

150.    Plaintiff will adequately and fairly represent the Company's interests in enforcing and prosecuting its rights and has retained counsel that is competent and experienced in stockholder derivative litigation.

## THE DEMAND BOARD CANNOT DISINTERESTEDLY AND/OR INDEPENDENTLY CONSIDER A DEMAND

151.    Plaintiff repeats and realleges each and every allegation above as if set forth in full herein.

152.    The Demand Board (*i.e.*, the current board of WBD) consists of AT&T appointees Li Haslett Chen, Samuel A. Di Piazza, Jr., Richard W. Fisher, Debra L. Lee, Fazal Merchant, Paula A. Price, and Geoffrey Y. Yang, and former Discovery board members Gould, Lowe, Malone, and Zaslav.

153.    Plaintiff has not made a demand on the Demand Board to investigate or initiate the claims asserted herein because demand is excused as futile.

---

[126]    "[T]he Distribution, taken together with certain related Transactions, will qualify as a 'reorganization' under Section 368(a)(1)(D) of the Code and a tax-free distribution under Section 355 of the Code . . . . [T]he Merger will qualify as a 'reorganization' under Section 368(a) of the Code . . . ."  Proxy at 15.

154.    Such demand would be futile and useless, and is thereby excused, because a majority of the 11-member Demand Board is conflicted and cannot disinterestedly or independently consider a demand to investigate and prosecute the claims herein.  Specifically, as detailed below, at least ten Demand Board members—Di Piazza, Fisher, Lee, Yang, Chen, Merchant, Price, Zaslav, Malone, and Gould—are conflicted, rendering demand futile.

**A.    Di Piazza, Fisher, Lee, Yang, Chen, Merchant, and Price**

155.    Di Piazza, Fisher, Lee, Yang, Chen, Merchant, and Price cannot disinterestedly or independently consider whether to pursue the claims alleged on behalf of the Company set forth herein.  Those seven Demand Board members were AT&T's appointees to the WBD Board in connection with the Transaction.  As reported in *The New York Times*, Zaslav "had to tread carefully" in seeking redress for AT&T's misrepresentations in connection with the Transaction, "given that AT&T appointed seven of Warner Bros. Discovery's 13 board members."[127]  *See supra* ¶74.  As a result, three knowledgeable insiders told *The New York Times* that Zaslav "expressed anger" but ultimately "stopped short of accusing AT&T of fraud."  *Id.*  Further, each of these directors gained the personal benefit of board appointment as a direct result of the Transaction, including an annual cash retainer of $125,000 and an annual grant of restricted stock units worth $220,000, along with additional compensation for the Board Chair and committee members.[128]

---

[127]    Stewart, *supra* n.13.  Two of the WBD board members that were not appointed by AT&T have since resigned.

[128]    WBD, Notice of 2023 Annual Meeting of Stockholders & Proxy Statement (Mar. 29, 2023), at 37.  Di Piazza, as Board Chair, receives an annual cash retainer of $300,000.  Price, as Audit Committee Chair, receives an additional annual cash retainer of $35,000.  Merchant, as an Audit Committee member, receives an additional annual cash retainers of $20,000.  Fisher and Yang, as Compensation Committee members, each receive additional annual cash retainers of $20,000.  Chen, Lee, and Merchant, as Nominating and Governance Committee members, each receive additional annual cash retainers of $10,000.

Under these circumstances, none of these directors can disinterestedly and independently assess whether to bring suit on behalf of WBD to redress AT&T's and Stankey's securities fraud in connection with the Transaction.

156.    Further, Di Piazza, Fisher, Lee, and Yang are conflicted because each was a member of the AT&T board when the Transaction was being negotiated and when AT&T materially misled Discovery, and each directly benefitted from the Transaction due to their holdings of AT&T stock.

157.    In particular, Di Piazza, Lee, and Yang joined the board of AT&T in 2015, 2019, and 2016, respectively, and each remained on the board of AT&T through the closing of the Transaction.  Fisher was on the board of AT&T from 2015 through April 30, 2021, which was after AT&T provided due diligence materials to Discovery on April 9, 2021.

158.    As AT&T directors, Di Piazza, Fisher, Lee, and Yang benefitted from and participated in the wrongdoing alleged herein and are not independent from AT&T or its CEO, Defendant Stankey.  Further, given their knowledge of the material information about WarnerMedia that AT&T concealed, Di Piazza, Fisher, Lee, and Yang cannot objectively consider or decide whether to prosecute these claims on behalf of the Company.  Indeed, as alleged herein, Di Piazza, Lee and Yang knew about the hidden $350 million in CNN+ startup costs in June 2021 when CNN's then-President Jeff Zucker "made a presentation in Dallas to **AT&T's board**, asking to approve the CNN+ launch and for $350 million to spend on it, which he got."[129]  Nonetheless, Di Piazza, Lee, and Yang made the decision as members of AT&T's board to move forward with negotiations with Discovery—and on May 16, 2021, AT&T's board, including Di Piazza, Lee,

---

[129]    Stewart, *supra* n.13 (emphasis added).

and Yang, ultimately decided to move forward with the Transaction—even though Discovery was not provided with that information.

159.    Di Piazza, Fisher, Lee, and Yang also received significant grants of AT&T stock pursuant to their AT&T board service and had substantial AT&T stockholdings, and therefore directly benefitted from Defendants' misrepresentations to Discovery in connection with the Transaction.  Consequently, they are not disinterested for purposes of assessing a demand in this matter.  Below is a chart setting out these directors' AT&T stockholdings as of December 31, 2020:[130]

|  | AT&T Stock Ownership | Ownership of AT&T Non-Voting Vested Stock Units[131] | Total |
|---|---|---|---|
| **Di Piazza** | $991,644.80 (34,480 shares) | $1,875,554.64 (65,214 shares) | $2,867,199.44 (99,694 shares) |
| **Fisher** | $413,885.16 (14,391 shares) | $1,076,15.56 (37,431 shares) | $1,490,400.72 (51,822 shares) |
| **Lee** | -- | $215,354.88 (7,488 shares) | $215,354.88 (7,488 shares) |
| **Yang** | $7,323,101.28 (254,628 shares)[132] | $876,834.88 (30,488 shares) | $8,199,936.16 (285,116 shares) |

---

[130]    Based on AT&T's December 31, 2020 closing price of $28.76/share.  *See* AT&T, 2021 Notice of Annual Meeting of Shareholders and Proxy Statement (Mar. 11, 2021) ("AT&T 2021 Proxy"), at 26.

[131]    Non-Voting Vested Stock Units represent the "number of vested stock units held by the Director or Executive Officer, where each stock unit is equal in value to one share of AT&T common stock.  The stock units are paid in common stock or cash depending upon the plan and the election of the participant at times specified by the relevant plan.  None of the stock units listed may be converted into common stock within 60 days of the date of this table.  As noted under 'Compensation of Directors,' AT&T's plans permit non-employee Directors to acquire stock units (also referred to as deferred stock units) by deferring the receipt of retainers into stock units and through a yearly grant of stock units. . . .  Stock units carry no voting rights."  *Id.*

[132]    The AT&Ts 2021 Proxy states that "Yang disclaims beneficial ownership of 33,558 shares held in a limited partnership" and that Yang shares voting and investment power with other persons in the amount of 131,035 shares (which presumably includes the 33,558 shares held in a limited partnership).  *Id.*

160.    Additionally, below is a chart setting out Di Piazza's, Lee's, and Yang's AT&T stockholdings as of December 31, 2021:[133]

| | AT&T Stock Ownership | Ownership of AT&T Non-Voting Vested Stock Units | Total |
|---|---|---|---|
| **Di Piazza** | $848,208.00 (34,480 shares) | $2,057,765,40 (83,649 shares) | $2,905,973.40 (118,129 shares) |
| **Lee** | -- | $377,290.20 (15,337 shares) | $377,290.20 (15,337 shares) |
| **Yang** | $6,386,061.60 (259,596 shares)[134] | $984.984.00 (40,040 shares) | $7,371,045.60 (299,636 shares) |

161.    Moreover, Di Piazza, Fisher, Lee, and Yang each received awards of deferred AT&T stock units worth $220,000 in 2020,[135] and Di Piazza, Lee, and Yang each received awards of deferred AT&T stock units worth $220,000 in 2021.[136]

## B.    David Zaslav

162.    Zaslav cannot disinterestedly or independently consider a demand to investigate and prosecute the claims alleged herein because he received material personal benefits in the Transaction, relating both to his outsized compensation package and to his newfound status as a major Hollywood mogul, as detailed below.  He also cannot independently consider a demand because of his personal friendship with Stankey, who was interested in the Transaction and faces

---

[133]    Based on AT&T's December 31, 2021 closing price of $24.60/share.  AT&T, 2022 Notice of Annual Meeting of Shareholders and Proxy Statement (Mar. 22, 2022) ("AT&T 2022 Proxy), at 31.  Fisher's AT&T stockholdings for 2021 were not included in AT&T's 2022 Proxy because he retired from the AT&T board on April 30, 2021.

[134]    AT&T's 2022 Proxy states that "Yang disclaims beneficial ownership of 33,558 shares held in a limited partnership" and that Yang shares voting and investment power with other persons in the amount of 131,035 shares (which presumably includes the 33,558 shares held in a limited partnership). *Id.*

[135]    AT&T 2021 Proxy, at 24.

[136]    AT&T 2022 Proxy, at 29.

a substantial likelihood of liability for his violation of Section 20(a) of the Exchange Act in connection with the Transaction.

### i.   Zaslav Received Massive Compensation in Connection with the Transaction

163.   Zaslav is conflicted because, as an integral part of the Transaction, Zaslav secured a hugely increased compensation package, worth over half a billion dollars, pursuant to the New Employment Agreement.

164.   As memorialized in the term sheet that AT&T submitted to Discovery on April 27, 2021, Zaslav successfully carved out his new role as Warner Bros. Discovery's CEO.[137]  With that role established, Zaslav pivoted to negotiating a new compensation package with the Discovery Compensation Committee.

165.   On May 6, 2021, Discovery's Compensation Committee—composed of R. Miron (Chairman), Gould, and directors Robert Beck and Kenneth Lowe—met for the first time to discuss Zaslav's new compensation plan.  During its first meeting, the Compensation Committee "determined that, **since one of the key terms** of the proposed transaction as agreed in the term sheet with AT&T was that Mr. Zaslav would continue to lead Discovery following a proposed transaction, it was in Discovery's best interest to negotiate a new employment agreement with Mr. Zaslav."[138]

166.   Gould served as the lead spokesperson for the Compensation Committee in discussions with Zaslav.  At the May 9, 2021 Compensation Committee meeting, "Gould reported

---

[137]   "On April 27, 2021, AT&T shared a draft term sheet. . . .  [The] draft term sheet provided, among other things that . . . (5) Mr. Zaslav would continue to serve as Chief Executive Officer of Discovery following the closing. . . ."  Information Statement at 180-81.

[138]   Proxy at 183 (emphasis added); *see also* Del. Ch. Compl. ¶169 (noting that "minutes of May 6, 2021 Compensation Committee meeting indicated that 'one of the key terms of [the] proposed transaction was that Mr. Zaslav would lead the company following the closing'").

on his discussions with Mr. Zaslav regarding extending the term of his employment with the Company beyond the term of his current agreement, which would expire December 31, 2023."[139] During the meeting, the Compensation Committee also discussed "Zaslav's request for an incentive award based on that received by Robert Iger in connection with The Walt Disney Company's acquisition of the entertainment assets of 21st Century Fox."[140]

167.    The board met later that day and "discussed the status of the new agreement with Mr. Zaslav."  Gould informed the board that "Zaslav had indicated that he wanted [a] new agreement and incentive award, effective upon signing of the merger agreement."[141]  Gould further reported that the Compensation Committee considered Zaslav's request and "determined to offer Mr. Zaslav a new five-year agreement," which would "maintain Mr. Zaslav's base salary and annual cash bonus target" and include an "equity incentive of $100 million which . . . was the amount of the equity grant received by Robert Iger, then the CEO of Disney, in connection with Disney's acquisition of Fox."[142]  Discovery's counsel then "discussed the contract extension for Mr. Iger . . . and summarized the key terms for the Board."  After that discussion, "it was the sense of the meeting that the Board was supportive of offering Mr. Zaslav a new agreement and an equity incentive similar to that received by Mr. Iger. . . ."[143]

168.    On May 10, 2021, Zaslav emailed Gould directly and sent him a list of "Key items for new deal."[144]  After further discussions, the Compensation Committee noted at its meeting on

---

[139]    Del. Ch. Compl. ¶171.

[140]    *Id.* at ¶171.

[141]    *Id.* at ¶173.

[142]    *Id.*

[143]    *Id.*

[144]    *Id.* at ¶174.

May 11, "Zaslav was in general agreement regarding the majority of the terms of the Committee's proposal. . . ."[145]  The Compensation Committee determined how to proceed with respect to the few remaining open items, and authorized Gould "to present the Committee's determinations on all of the remaining open issues to Mr. Zaslav."[146]

169.    Later that day, Discovery's board "discussed the status of the new agreement with Mr. Zaslav."[147]  Gould informed the board that "the Committee and Mr. Zaslav had preliminarily agreed [to] certain terms, including a new, five-year contract and a new stock option grant broken into multiple tranches with escalating exercise prices."[148]  Gould further told the board that the "Committee would continue to work with a goal of providing a term sheet to [AT&T] later in the week and signing the new contract with Mr. Zaslav concurrent with the signing of the proposed transaction."[149]

170.    On May 12, the Compensation Committee met and decided on the final terms, which it recommended the board offer Zaslav.[150]  Later that day, the board agreed to offer those terms to Zaslav.

171.    Ultimately, Discovery's board approved Zaslav's New Employment Agreement, which resulted in a compensation package valued in total for 2021-2027 at approximately $503 million.  $338 million of this amount represents the five-year value above and beyond Zaslav's

---

[145]    *Id.* at ¶177.

[146]    *Id.* at ¶177.

[147]    *Id.* at ¶178.

[148]    *Id.*

[149]    *Id.*

[150]    *Id.* at ¶¶179-80.

preexisting contract.[151]   As illustrated in the chart below, there are four main components to Zaslav's New Employment Agreement: (1) salary; (2) annual bonus; (3) restricted stock units; and (4) stock options.[152]

| Element | Currrent Contract | | New Contract and $100M Equity | |
|---|---|---|---|---|
| | Annual | 5 Year Total | Annual | 5 Year Total |
| Salary | $3 | $15 | $3 | $15 |
| Bonus | $22 | $110 | $22 | $110 |
| RSU | $12 | $60 | $12 | $60 |
| Options | $18 | $90 | $38 | $190 |
| Total | $55 | **$275** | $75 | **$375** |
| | | | | |
| Total Cash | | $125 | | $125 |
| Total Equity | | $150 | | $250 |
| | | | | |
| % Cash | | **45%** | | **33%** |
| % Equity | | **55%** | | **67%** |
| | | ^ | | ^ |
| | 40% RSU / 60% Options | | 24% RSU / 76% Options | |

172.   The total estimated value of Zaslav's compensation package in light of the New Employment Agreement is summarized in the below chart:[153]

---

[151]   *Id.* at ¶180 n.179 ("new deal value is not $375M since 2018 agreement already provides for 2023 benefits of $3M salary + $22M bonus + $12M RSUs. New deal value is $338M ($37M less)").

[152]   *Id.* at ¶¶179-80.

[153]   Del. Ch. Compl. ¶181.

| Year | Salary | Target Bonus | Current Contract RSU | New Contract RSU | Current Contract Options | New Contract Options | $100M Stock Options | Total |
|---|---|---|---|---|---|---|---|---|
| 2021 | $3 | $22 | $12 | | $18 | | $20 | **$75** |
| 2022 | $3 | $22 | $12 | | $18 | | $20 | **$75** |
| 2023 | $3 | $22 | | $12 | $18 | $18 | $20 | **$93** |
| 2024 | $3 | $22 | | $12 | | $18 | $20 | **$75** |
| 2025 | $3 | $22 | | $12 | | $18 | $20 | **$75** |
| 2026 | $3 | $22 | | $12 | | $18 | | **$55** |
| 2027 | $3 | $22 | | $12 | | $18 | | **$55** |
| | | | | | | | Total | **$503** |

173.     Under the New Employment Agreement, Zaslav will remain Warner Bros. Discovery's CEO for a six and a one-half year term running through December 31, 2027.  Zaslav's annual salary will remain $3.0 million, and his target annual bonus will remain $22.0 million.  However, after 2021, the annual bonus could exceed $22 million, subject to a cap of 125% of the target amount.  Zaslav is eligible to receive $12 million in restricted stock units granted annually subject to certain performance metrics.

174.     The largest portion of the New Employment Agreement consists of stock options.  Pursuant to the agreement, Zaslav was granted two major awards of stock options, each of which was valued upon his signing of the agreement and granted in five equal tranches.  The first tranche in each group has an exercise price of $35.65 (the closing price of Series A on the last business day prior to May 16, 2021).  The exercise price in each tranche increases 5% for each tranche in each group, ranging from 105% to 121.55% of the $35.65 exercise price.

175.     The sheer size of Zaslav's compensation plan is staggering.  The total approximate value of the compensation plan (which includes components of Zaslav's 2018 contract) as of the

time it was entered into was **$503 million**.[154]  The new stock options grant alone had an aggregate grant date fair value of **$190 million**.  Based on the options and other compensation Zaslav was granted in 2021, his total compensation that year alone was valued at approximately **$246.5 million**.[155]

176.    According to *The Wall Street Journal*, in 2021, Zaslav was the second highest-paid CEO among all S&P 500 companies.  As of March 14, 2022, Zaslav's compensation plan was the highest CEO pay reported by any S&P 500 company for 2022.[156]

177.    Zaslav's compensation is enormous in both absolute terms and relative to peer CEO compensation.[157]  For example, Zaslav's compensation vastly exceeds the highest earning years of CEOs of well-established media companies (and Warner Bros. Discovery's most important competitors), such as the $43.22 million earned by Reed Hastings (Co-Founder and Co-CEO of Netflix) in 2020,[158] the $38.97 million earned by Robert Bakish (CEO of Paramount Global, f/k/a ViacomCBS, Inc.) in 2020,[159] and the $149.63 million stock grant awarded to then-CEO Robert

---

[154]    *Id.*

[155]    Warner Bros. Discovery, Inc., Definitive Proxy Statement (Mar. 14, 2022), at 56.

[156]    Benjamin Mullin, *Discovery CEO Received $246 Million in Compensation in 2021, Including Big Options Grant*, WALL STREET JOURNAL (Mar. 14, 2022), https://www.wsj.com/articles/discovery-ceo-received-246-million-in-compensation-in-2021-including-big-options-grant-11647295362.

[157]    As disclosed in WBD's Definitive Proxy Statement filed on March 14, 2022, the Croner Company, Discovery's compensation consultant, identified the following companies in WBD's "Peer Group," which was "used for purposes of 2021 compensation decisions": Activision Blizzard, Inc, AMC Networks, Inc., CBS Corporation, Charter Communications, Inc., Electronic Arts Inc., Fox Corporation, Liberty Global plc, Lions Gate Entertainment Corp., Netflix, Inc., Sirius XM Holdings Inc., The Walter Disney Company, and ViacomCBS Inc. (now known as Paramount Global).  Warner Bros. Discovery, Inc., Definitive Proxy (Mar. 14, 2022), at 36.

[158]    Netflix, Inc., Definitive Proxy Statement (Apr. 22, 2022), at 72.

[159]    Paramount Global, Definitive Proxy Statement (Apr. 15, 2022), at 55.

Iger of The Walt Disney Company in 2018.[160]  Even Malone has acknowledged that, "on paper, Zaslav appeared to be overpaid."[161]

178.    In a report issued in 2022, influential proxy advisor Institutional Shareholder Services ("ISS") recommended that WBD stockholders vote against Zaslav's new compensation plan, citing "significant concerns" with "excessive" stock option grants to Zaslav.[162]  ISS further stated: "The company has a long history of poor pay practices, which have persisted in 2021. . . .  Equity awards of this magnitude are unusual and are in addition to the annual grants of equity Zaslav received in 2021 and is expected to receive going forward."[163]

179.    Given this staggering compensation, the Proxy concedes Zaslav's lack of independence with respect to the Transaction.[164]

### ii.    The Transaction Made Zaslav a Leading Hollywood Mogul

180.    The Transaction also materially benefitted Zaslav by propelling him into the top tier of Hollywood moguls.  Before the Transaction, as CEO of Discovery, Zaslav led a Company that focused on high-revenue but relatively "lowbrow" reality-based programming.[165]    By

---

[160]    The Walt Disney Company, Definitive Proxy Statement (Jan. 17, 2020), at 37.

[161]    Etan Vlessing, *Billionaire Investor John Malone's Streaming Wars Update: "There's a Lot of Blood Flowing Down the Gutters,"* THE HOLLYWOOD REPORTER (Nov. 17, 2022), https://www.hollywoodreporter.com/business/business-news/john-malone-talks-streaming-wars-1235264416.

[162]    Patrick Temple-West, *Proxy Adviser ISS Urges Vote Against $247mn Pay For Discovery Chief*, FINANCIAL TIMES (Mar. 28, 2022), https://www.ft.com/content/3d192ccc-4094-42cc-8964-742c7f8250ed.

[163]    *Id.*

[164]    Proxy at 223-24, 227-28 (acknowledging that "certain of Discovery's directors and executive officers . . . may have interests in the Transactions that may be different from, or in addition to, those of Discovery stockholders generally," and listing the "David M. Zaslav Employment Agreement" in this context).

[165]    Felix Gillette & John Koblin, IT'S NOT TV: THE SPECTACULAR RISE, REVOLUTION AND FUTURE OF HBO 354 (2022).

contrast, after the Transaction, Zaslav now leads a much-expanded Company that includes "Big Five" Hollywood studio Warner Bros. Pictures; prestigious television network HBO; comic book empire DC Comics; former Turner Broadcasting System assets including CNN, TBS, and TNT; and numerous other media properties.

181.   Zaslav had been eyeing WarnerMedia snice long before the Transaction, and made his first pitch to combine Discovery and WarnerMedia in April 2019.[166]  Zaslav recognized that Discovery lacked the scripted series and movies that WarnerMedia offered, and observed prior to the Transaction: "Almost all of the players in the business moved toward scripted series and scripted movies.  They went to the big stars and the red carpet.  The big shiny object.  We're not as shiny,' he continued, 'and we don't have a lot of red carpets."[167]

182.   As *It's Not TV: The Spectacular Rise, Revolution and Future of HBO* notes, "The red carpets of HBO beckoned" Zaslav.[168]  After the Transaction was announced, Zaslav "took up every chance he could get to talk up the network he long admired," and said: "My gosh, HBO. . . .  Our ambition is that those three letters, everywhere in the world, people are going to say that's the place to go to see great stories, great talent, and just have some fun.'"[169]  Zaslav "revered HBO as the trailblazing network that started it all," and said: "To me, HBO was like the gravitational pull into this industry. . . .  Not only do I love it, but I think it's gonna make it.  It was the lead horse for the industry for a long, long time."[170]  Befitting his new status as a "media tycoon,"

---

[166]   *Id.*

[167]   *Id.* at 355.

[168]   *Id.*

[169]   *Id.* at 356.

[170]   *Id.*

Zaslav "swanned about, looking on approvingly" at a party celebrating the third season of the HBO series *Succession* in October 2021.[171]

183.   After the Transaction was announced, Zaslav remarked: "I think this deal will be the first sentence of my obituary."[172]   A *Vanity Fair* article noted that that Transaction "has catapulted Zaslav to the upper reaches of the stratosphere."[173]   Joy Behar, a friend of Zaslav, exclaimed: "[T]his is a big f***ing deal for David Zaslav and for the industry."[174]

184.   *Vanity Fair* further reported that Zaslav's "new rock star clout was apparent when dozens of moguls emerged from quarantine in July [2021] and returned to the mountains of Sun Valley, Idaho, for the annual Allen & Company retreat.  'There was a line wherever he was,' said Oprah Winfrey, who didn't go this year, but got a scene report from Gayle King.  Another big shot who was there confirmed, 'it was certainly a new level of activity.'"[175]   Wall Street analyst Michael Nathanson added: "With this deal, [Zaslav's] leadership has a much broader impact on society.  He's like a [Disney CEO] Bob Iger.  The assets he will manage will have so much more of an impact on society and the public conversation than anything he's done to this point."[176]   Zaslav was even captured gazing at the iconic Warner Bros. water tower on the studio lot, gushing: "Can you believe this? . . . It's really happening."[177]   The Transaction conferred the life-changing benefit

---

[171]     *Id.* at 370.

[172]     Joe Pompeo, *All That Zaz: With Warner Bros. Discovery Merger, David Zaslav Is Angling to Become America's King of Content*, VANITY FAIR (Nov. 2021), https://www.vanityfair.com/news/2021/10/david-zaslav-is-angling-to-become-americas-king-of-content.

[173]     *Id.*

[174]     *Id.*

[175]     *Id.*

[176]     *Id.*

[177]     *Id.*

of transforming Zaslav from a "second-tier media executive" at a "less consequential" company[178] into a leading Hollywood tycoon.

185.   A report in *The New York Times*, based on interviews with "more than 100 executives, agents and actors about Zaslav's leadership" of WBD, confirms the magnitude of the benefit that Zaslav received from his newfound status as a result of the Transaction:[179]

> It was April 2022, and David Zaslav had just closed the deal of a lifetime.  From the helm of his relatively small and unglamorous cable company, Discovery, he had taken control of a sprawling entertainment conglomerate that included perhaps the most storied movie studio on the planet, Warner Brothers.  The longtime New Yorker had always loved movies, and against the advice of several media peers, he had moved to Hollywood and taken over Jack Warner's historic office, hauling the old mogul's desk out of storage and topping it off with an old-time handset telephone.  So far things were going great.  He had met all the stars and players, was widely feted as the next in line to save the eternally struggling industry and was well into the process of renovating a landmark house in Beverly Hills.[180]

186.   The report also explains why this benefit was of enormous personal significance to Zaslav:

> At 63, Zaslav is two generations removed from the Jewish outsiders—William Fox, Adolph Zukor, Samuel Goldwyn—who fled the shtetls of Europe a century ago and built Hollywood, making movies that went a long way toward defining the American dream.  Zaslav, whose paternal grandfather sold plumbing supplies out of a wheelbarrow on the Brooklyn Bridge, sees himself as part of this lineage of unlikely moguls, and in fact his grandmother grew up in Warsaw not far from where Jack Warner's parents were raised.  "His family and my family came here with nothing," Zaslav said.

> As a young boy in Brooklyn, Zaslav spent Saturday afternoons at the movies with his father, who worked for the family plumbing business, now called Zaslav & Sons, while attending law school at night.  "Cool Hand Luke," "Funny Girl" and "Butch Cassidy and the Sundance Kid" all loom large in his memory. . . .

> Zaslav's love of Hollywood is sincere.  He bought his house in Beverly Hills before he got his current job—and it wasn't just any house: It was Woodland, the home of

---

178      *Id.*

179      Mahler et al., *supra* n.125.

180      *Id.*

Robert Evans, the legendary producer of "The Godfather" and "Chinatown." Greta Garbo once stayed there, and during Evans's heyday at Paramount in the 1960s and '70s, it was a favorite hangout for Hollywood's biggest stars. Zaslav pursued the house even before it went on the market. After Evans died in 2019, another Hollywood-connected friend of Zaslav's, Graydon Carter, the former editor of Vanity Fair, reached out to Evans's ex-wife Ali MacGraw, attesting to Zaslav's intention to meticulously restore Woodland to its vibrant, Old Hollywood glory. . . .

[T]he acquisition also represented much more than a financial lifeline for Zaslav. "He really felt emotional," says Barry Diller, an old friend and fellow media mogul, describing Zaslav's reaction to the acquisition. "He thought, Oh, my God, I inherited Jack Warner and the great Warner Brothers water tower. Sincerely, I think he believes in the old-time movie business. Why not? He came from nowhere."[181]

187.    Finally, the report confirms that, notwithstanding the challenges that WBD has faced, Zaslav continues to reap the benefits conferred by the Transaction:

Zaslav has no intention of giving up Jack Warner's office—and the renovation of Woodland is progressing, if slowly—but he has been spending less time on the studio lot lately and more time at the company's corporate offices in New York. He has had his ups and downs in Hollywood, but that's the nature of the business. Someone is always screwing someone or getting screwed by someone. And then they make up and do a movie together. "D.Z. loves running this!" Diller says. "Are you kidding? He's the happiest clam in the universe." . . .

Media moguls may be boldfaced names, but they are not talent. Zaslav, whose large circle of friends includes plenty of both, understands this distinction. Several years ago, when he was still trying to save Discovery, he had dinner at Jimmy Buffett's Hamptons home with Richard Plepler, then the head of HBO. "You know, Richard, we have to keep our seats," he told Plepler afterward. "Jimmy is a legend, but without the jobs, we're nothing."[182]

188.    In light of the massive personal and financial benefits Zaslav received in the Transaction, he cannot disinterestedly consider a demand in this matter.

---

[181]      *Id.*

[182]      *Id.*

### iii.     Zaslav's Friendship with Stankey

189.    Zaslav is also conflicted due to his friendship with Defendant Stankey.  Indeed, as reported in a *Reuters* article, the process that led to the Transaction "all started with two friends commiserating."[183]   Zaslav emailed Stankey "to lament how the COVID-19 pandemic had led to them missing the AT&T Pebble Beach golf tournament in California, where the two friends had planned to meet."[184]   Zaslav added "golfer and sunglasses" emoticons, and continued: "You around. . . .  I've been thinking. . . ."  Stankey quickly replied: "Always scares me when you do that :) . . . Would you like to chat?"[185]  As noted in an entertainment industry publication, "AT&T's Stankey and future Warner Bros. Discovery Chief Zaslav are personally close friends and golfing buddies."[186]  Zaslav would thus be unable to independently assess a demand to sue Stankey in this matter.

---

[183]     Kenneth Li & Krystal Hu, *How A Golf Tournament Led To The Merger Of Discovery, WarnerMedia*, REUTERS (May 17, 2021), https://www.reuters.com/technology/how-canceled-golf-tournament-led-merger-discovery-warnermedia-2021-05-17.

[184]     *Id.*

[185]     John Koblin et al., *Inside the Discovery-AT&T Deal: Cute Emails, a Big Loan and Now, a Media Giant*, THE NEW YORK TIMES (May 21, 2021), https://www.nytimes.com/2021/05/21/business/media/att-discovery-warnermedia-deal.html; Georg Szalai & Alex Weprin, *Discovery CEO David Zaslav on WarnerMedia Deal: Relationships With Talent Will Be "Number One Priority,"* THE HOLLYWOOD REPORTER (May 17, 2021), https://www.hollywoodreporter.com/business/business-news/discovery-att-deal-ceo-stankey-zaslav-1234954116.

[186]     Bailey Barger, *Discovery and WarnerMedia Merger Approved By Stockholders*, SCREEN RANT (Mar. 12, 2022), https://screenrant.com/discovery-warner-merger-approved-update; *see also id.* ("Zaslav shared in May that the decision for him to lead the new company was born out of a two-hour text exchange between the two of them that led to a negotiation in Zaslav's Brownstone in New York City.").

### D.    John Malone

190.    Malone cannot disinterestedly or independently consider a demand to investigate and prosecute the claims alleged herein because he is not independent from Zaslav, who received material personal benefits in the Transaction as detailed above.

#### i.    Malone Is Not Independent From Zaslav

191.    Malone cannot independently consider a demand in this matter due to his close ties with Zaslav.  Zaslav is one of Malone's closest business associates, confidants, and friends.[187] Zaslav openly acknowledges that Malone "is **a teacher, and a best friend and really a father to me**."[188]  As one reporter aptly stated, "John Malone is David Zaslav's mastermind."[189]  And as confirmed by one media insider, "John Malone is the brains of the [Discovery] operation."[190] Malone's relationship with Zaslav spans over three decades.  Malone has been described as "an important mentor to Zaslav over the years, and one of his most enthusiastic backers."[191]  As Zaslav himself has said of Malone: "We've known each other for 30 years.  We talk every day.  He's an extraordinary—he has extraordinary vision.  I learn from him every day.  **It's probably the greatest gift to me in my life.**"[192]  Given these statements, it is no surprise that the Delaware Court

---

[187]    Andrew Bary, *The AT&T-Discovery Merger Doesn't Happen Without This Master Deal Maker. Why More Deals Could Be Coming*, BARRON'S (May 21, 2021), https://www.barrons.com/articles/att-discovery-deal-john-malone-51621622500.

[188]    Brooks Barnes & Nicole Sperling, *A Titan Ascends In Media World's Game of Thrones*, THE NEW YORK TIMES (May 17, 2021), https://www.nytimes.com/2021/05/17/business/warnermedia-discovery-kilarzaslav.html (emphasis added).

[189]    *Id.*

[190]    *Id.*

[191]    William D. Cohan, *The Secret Power Behind Zazworld*, PUCK NEWS (Feb. 16, 2022), https://puck.news/the-secret-power-behind-zazworld.

[192]    *Id.* (emphasis added).

of Chancery has drawn a pleading stage inference in multiple cases that Zaslav lacks independence

from Malone, and that Zaslav has even conceded his lack of independence from Malone.[193]

192.     Zaslav was personally "recruited to lead Discovery by . . . John Malone" in January

2007, after Zaslav had been passed over for the role of CEO of NBC Universal, Inc.[194]   Since

January 2007, Zaslav has been CEO of Discovery and has been one of the highest paid executives

during that time.  According to one report, "it pays to work for John Malone" because "the C.E.O.s

at the companies he oversees are routinely among the best compensated managers on the

planet."[195]

193.     Zaslav has been a primary beneficiary of Malone's generosity.  Since January 2007,

Zaslav has been Discovery's President and CEO, and he has been a director since September 2008.

Zaslav has profited immensely at the helm of Discovery, with compensation during the 2007-2021

period totaling nearly $1 billion.

---

[193]     *See Fishel v. Liberty Media Corp., et al.*, C.A. 2021-0820-KSJM (Del. Ch. Nov. 1, 2022), at 18, 21 (TRANSCRIPT) ("Defendants [including Zaslav] do not attempt to defend the impartiality of six" directors of SiriusXM, including Zaslav, from Malone-controlled Liberty Media Corporation . . . . "Because Plaintiff has adequately pled at least eight of the Company's 13 directors lack independence from Liberty Media, Defendants' motion to dismiss under Rule 23.1 is denied."); *Rux v. Meyer*, C.A. No. 11577-CB (Del. Ch. Nov. 18, 2016), at 13-14 (TRANSCRIPT) (In a ruling issued three days after oral argument on the motion to dismiss, then-Chancellor Bouchard held that Zaslav, the CEO of then-Discovery Communications, could not be independent of Malone because of Malone's "history with the company, his ability to ultimately control over 30 percent of the voting power of the company, and his position on that board.").

[194]     Claudia Eller & Cynthia Littleton, *How David Zaslav Plans to Combine Discovery and WarnerMedia to Unleash "Shock and Awe" On The Streaming Wars*, VARIETY (Dec. 8, 2021), https://variety.com/2021/biz/entertainment-industry/david-zaslav-warner-bros-discovery-1235127820/.

[195]     David Gelles, *For the Highest-Paid C.E.O.s, the Party Goes On*, THE NEW YORK TIMES (May 16, 2015), https://www.nytimes.com/2015/05/17/business/for-the-highest-paid-ceos-the-party-goes-on.html.

194.    Zaslav, along with the other highly compensated executives in the Malone empire, have acknowledged how thankful they are for the impact Malone has made on their careers.  In August 2012, Zaslav, along with Gregory Maffei and Michael Fries, donated $1 million in honor of Malone to name the theater at The Cable Center in Denver, Colorado, the "John Malone Theater."[196]   In making the donation, Fries, Maffei, and Zaslav issued the following joint statement: "The naming of this theater in honor of John Malone is a small token of our appreciation for all that he has done for us in our careers, as well as for the industry as a whole. . . .  Without John Malone, there would be no cable industry as we know it, and **we are forever in debt to his vision, perseverance and dedication**."[197]   At the dedication ceremony, Zaslav gave a speech giving praise and thanks to Malone:

> **I'm grateful to be a part of your business family.  You're a great leader and a great mentor.  But most importantly, I want to thank you for all you've done for me and all you've done for my family** and I think that represents why everyone is here.[198]

195.    In a 2018 interview, Zaslav told Bloomberg that he considered himself "one of luckiest guys" when describing his affiliation and relationship with Malone:

> David Westin (Bloomberg): What is it like to have John Malone as somebody you can call up and say, should we do this?  Should we do that?  What do you think about what's going on?
>
> David Zaslav: Well, you know, I think about, [] my last 30 years in this business and, uh, and **it's sort of like what you want for your children . . . you are who you hang out with** and it it, it really helps to define you the narrative that you hear, the questions that you hear.  And so I look back over the last 30 years and, you know, 15 years listening to why Jack didn't want to do an acquisition that we

---

[196]    *Welcome to John Malone Theater*, LIGHT READING (Aug. 22, 2012), https://www.lightreading.com/cable-video/video-services/welcome-to-john-malone-theater/d/d-id/697816.

[197]    *Id.* (emphasis added).

[198]    The Cable Center, *Malone Theater Dedication 2012*, YOUTUBE (Oct. 4, 2012), https://www.youtube.com/watch?v=cqOAC5cGyBs (emphasis added).

brought him or what we need to do with cable, how we need to do it.  You know, Bob Wright, one of the, one of the most successful guys running NBC, the Newhouse family, Donald and S.I. Newhouse, and Bob Miron, who's a genius and has been in the cable business and built Brighthouse and **John Malone.**  And so when I think about where people should be spending their time, yes, you want the right, you'd like to get the right job.  Yes.  You'd like to think that you're gonna make, uh, some money, but I took a 50% pay cut to go to NBC from a law firm because I thought I can get to hangout with the guys at the peacock and maybe someday I'll get to meet Jack.  And a lot of the way I see the world, I still talk to Jack all the time is so I'm, I'm hearing Jack's voice.  I'm hearing, [] Bob Miron and Donald Newhouse's voice and **I'm hearing John's voice.  And so for that alone, I'm one of the luckiest guys.**[199]

196.    In addition to showering Zaslav with lucrative compensation, Malone places a high degree of trust in Zaslav, especially with respect to voting rights and corporate governance.  On February 13, 2014, Malone entered into an agreement granting Zaslav voting and purchase rights to Malone's Series B Discovery shares.  Pursuant to that agreement, Zaslav was able to vote John Malone's Series B shares, unless Malone himself voted or directed the vote of such shares,[200] as long as Zaslav remained employed as (then-Discovery Communications') CEO or on its board of directors.  In addition, Zaslav had a right of first refusal to purchase Malone's Series B shares in the event Malone decided to sell them.[201]

197.    As is Malone's common practice with executives of companies he controls, Zaslav has held other titles in the Malone web of enterprises.  Currently, Zaslav is a member of the board of Malone-controlled SiriusXM, where he has served as a director since May 2013.  From 2015 to

---

[199]    Bloomberg Markets and Finance, *Discovery CEO David Zaslav Says He's "One of the Luckiest Guys,"* YOUTUBE (Apr. 18, 2018), https://www.youtube.com/watch?v=LFXovmAfkSs (emphasis added).

[200]    Because Malone voted his Discovery shares himself in approving the Transaction pursuant to the voting agreement, Zaslav did not vote Malone's shares in that instance.

[201]    According to Discovery's public filings, this agreement was still in effect at the time of the Transaction.  Warner Bros. Discovery, Inc., Information Statement/Prospectus (Mar. 28, 2022), at 310.

Case 1:24-cv-00420-UNA   Document 1   Filed 04/03/24   Page 72 of 80 PageID #: 72

2021, Malone designated Zaslav to Lions Gate's board of directors.  In November 2015, Malone-controlled Liberty Global and Discovery Lightning Investments Ltd., a wholly owned subsidiary of Discovery predecessor Discovery Communications Inc., and Malone-affiliated DCI, each purchased five million shares of Lions Gate stock and entered into an investor rights agreement. Pursuant to the investor rights agreement, Lions Gate increased its board of directors to 14 members and added Zaslav to its board.  Zaslav remained a member of Lions Gate's board until 2021.

198.    Malone's close friendship with Zaslav extends to each of their respective families. As pictured below, in May 2016, Zaslav (left) and his wife Pam (right) attended the UJA Federation of New York Leadership Awards Dinner honoring Malone (center):



199.    At the event, Zaslav (right) and his wife sat at Malone's table with Malone's family, including Malone (center) and Malone's son Evan (left):

- 72 -



**E.      Paul Gould**

200.    Gould cannot disinterestedly or independently consider a demand to investigate and prosecute the claims alleged herein because he received a material personal benefit in the Transaction, and because he is not independent from Malone, who is conflicted as set out above.

201.    Gould has worked at Allen & Co. for over 50 years, since 1972, including serving as a Managing Director and Executive Vice President for more than five years.  Gould is a senior member of Allen & Co.'s mergers and acquisition practice.[202]  Allen & Co. received a $75 million success fee for the financial advisory services it provided to Discovery in connection with the Transaction.  As a result, Gould was listed in the Proxy as a Discovery director who "may have interests in the Transactions that may be different from, or in addition to, those of Discovery stockholders generally."[203]

202.    Gould also cannot independently consider a demand in this matter due to his close ties with Malone.

---

[202]      Radius Global Infrastructure, Inc., Definitive Proxy (Apr. 8, 2022), at 11.

[203]      Proxy at 223-224.

203.    Gould is one of Malone's closest business associates and friends.  Gould's business relationship and friendship with Malone dates back to the late 1980s, when Gould and his firm Allen & Co. became Malone's go-to investment banker for TCI.  In 1995, when TCI founder Bob Magness passed away and left a vacant board seat, Malone personally chose Gould to fill the open board seat at TCI.  As explained in *Cable Cowboy: John Malone and the Rise of the Modern Cable Business*, "Gould [was] TCI's longtime Allen & Company adviser whom Malone had chosen to replace Bob Magness on TCI's board. . . ."[204]

204.    Gould's appointment to TCI's board was the start of his serial director appointments to Malone-affiliated companies for the next two decades.  Malone recruited Gould to sit on the board of Discovery's predecessor, Discovery Holding Company, in May 2005.  From 1999 to August 2009, Gould was a member of Liberty Media LLC's board, and then joined the board of Malone-controlled Liberty Media.

205.    On August 7, 2009, when Liberty Media owned 54% of The DIRECTV Group, Inc.'s ("DTV") outstanding common stock, Gould resigned from the Liberty Media board to become a Liberty Media-appointed member of the board of DTV.  In exchange for Gould's loyalty, prior to Gould's resignation from the Liberty Media board, the Liberty Media board amended Gould's equity incentive awards in his favor.[205]

206.    Currently, Gould serves as a director on the boards of several companies that Malone either controls or exerts significant influence over including, but not limited to, Liberty Latin America Ltd. and Liberty Global plc.

---

[204]    Mark Robichaux, CABLE COWBOY: JOHN MALONE AND THE RISE OF THE MODERN CABLE BUSINESS 306 (2002).

[205]    Liberty Media Corp., Form 8-K (Aug. 12, 2009), at 2.

207.    In addition to being longtime business associates, Gould and Malone are also longtime friends.  For decades, Gould and Malone have shared a common hobby: sailing.  Gould is "an amiable and regular sailor on Malone's boats."[206]  According to reports, "Malone had never liked sailing with a hired crew. **He prefer[s] the privacy of friends** and the responsibility of charting a course. . . ."[207]  In one episode in the fall of 1998, Malone invited Gould and two others on a week-long boating expedition from Maine to Florida on his 80-foot motor yacht, "Liberty."[208]  While at sea, Liberty was caught in heavy rains and rough waves such that Gould and two others were forced to operate the yacht in shifts.[209]  The next day, Malone brought Liberty into Annapolis, Maryland, where the men cleaned up and grabbed dinner at Buddy's Crabs and Ribs.[210]

208.    Malone has also invited Gould to property he owns in Colorado.  "Occasionally, [Malone] would take friends out on massive tracts of land he owned south of Denver. . . . One afternoon, on a tour with Romrell, Gould, and Barton on four-wheel all-terrain vehicles, Malone left his comrades in a puff of dust. He led the pack to a brush-covered plateau that offered an extraordinary view of the Rockies some 20 miles away."[211]

---

[206]    Robichaux, *supra* n.231 at 308; George Mannes, *March "Magness" Hits Liberty As Director Quits*, THE STREET (Mar. 25, 2003), https://www.thestreet.com/technology/march-magness-hits-liberty-as-director-quits-10076397 (Gould has also been called a "frequent sailing buddy" of Malone).

[207]    Robichaux, *supra* n.231 at 308 (emphasis added).

[208]    *Id.* at 305-308.

[209]    *Id.* at 309.

[210]    *Id.* at 309-10.

[211]    *Id.* at 356.

209.    Due to Gould's deep ties with Malone, academics have identified the Gould-Malone pairing as the second (out of five) "most-entangled controller-independent director pairing."[212]

## LOSS CAUSATION AND ECONOMIC LOSS

210.    Defendants' wrongful conduct directly and proximately caused the economic loss suffered by the Company.  Had Defendants not engaged in the wrongful conduct set forth herein, the Transaction would not have been agreed upon, approved by stockholders, and/or closed on the same terms and/or at all.  As a result, the Company suffered economic loss, *i.e.* damages, under the federal securities laws.

## NO SAFE HARBOR

211.    The statutory safe harbor for forward-looking statements does not apply to the false statements and omissions pled herein.  Such statements all relate to then-existing facts and circumstances.  To the extent certain of the statements alleged to be false and misleading may be characterized as forward-looking, they were not adequately identified as "forward-looking" statements when made, and were not accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, Defendants are liable for any such forward-looking statements because at the time each of those purportedly forward-looking statements was made, the speaker knew that the statement was false and misleading, and/or the

---

[212]    Da Lin, *Beyond Beholden*, 44 J. CORP. L. 515, 542 (2019) ("As a result, directors can use their directorships as a portal of entry by which to form additional connections with and gain future benefits from controlling shareholders.  From the perspective of the directors, other lucrative posts may be obtainable—if the directors remain on good terms with the controllers.  Controlling shareholders' power to grant or withhold these benefits then has the potential to shape the directors' allegiances.").

statement was authorized and/or approved by a person with ultimate authority for the statement who knew that it was false and misleading when made.

## COUNT I

### DERIVATIVE CLAIM FOR VIOLATIONS OF SECTION 10(B) OF THE EXCHANGE ACT AND RULE 10B-5 PROMULGATED THEREUNDER AGAINST AT&T

212.     Plaintiff repeats and realleges each and every allegation above as if set forth in full herein.

213.     AT&T carried out a plan, scheme, and course of conduct that was intended to and did deceive the Company and cause the Company to acquire the stock of Spinco (the AT&T subsidiary into which AT&T spun-off its WarnerMedia business) at an artificially inflated price in the Transaction.  In furtherance of this unlawful scheme, plan, and course of conduct, AT&T took the actions set forth herein, including misrepresenting and concealing from Discovery the severity of WarnerMedia's financial and business challenges, overstating WarnerMedia's financial performance and projections, concealing $350 million in start-up costs for CNN+ from the projections and budgets that it provided to Discovery in connection with the Transaction, and concealing the fact that WarnerMedia had largely halted external content sales.

214.     AT&T (1) employed devices, schemes, and artifices to defraud; (2) made untrue statements of material fact and/or omitted material facts necessary to make the statements not misleading; and (3) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the Company in an effort to sell Spinco securities to the Company at an artificially inflated price in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5.

215.     AT&T had actual knowledge of the misrepresentations and omissions of material facts set forth herein, as and to the extent alleged herein, or acted with reckless disregard for the

truth in that AT&T failed to ascertain and to disclose such facts, even though such facts were available to it.

216.    As a direct and proximate result of AT&T's wrongful conduct, the Company suffered damages in connection with the Transaction by acquiring Spinco common stock at an artificially inflated price.

217.    Discovery entered into the Transaction and acquired Spinco common stock in reliance on AT&T's material misrepresentations and omissions set forth herein.  In light of the facts set forth herein, Discovery would not have acquired Spinco common stock at the price it paid in the Transaction, or at all, if it had been aware of the facts that AT&T concealed.

218.    By reason of the foregoing, AT&T violated Section 10(b) of the Exchange Act and the Company is entitled to relief.

## COUNT II

### DERIVATIVE CLAIM FOR VIOLATIONS OF SECTION 20(A) OF THE EXCHANGE ACT AGAINST STANKEY

219.    Plaintiff repeats and realleges each and every allegation above as if set forth in full herein.

220.    Stankey acted as a controlling person of AT&T within the meaning of Section 20(a) of the Exchange Act.  By virtue of his high-level position as CEO, his leadership of and participation in AT&T's negotiations with Discovery, his participation in and/or awareness of AT&T's and WarnerMedia's operations, and his intimate knowledge of the false and/or misleading statements made to the Company, Stankey had the power to influence and control—and did influence and control, directly or indirectly—AT&T's decision-making, including the content and dissemination of the various false and/or misleading statements.  Stankey was provided with or had unlimited access to copies of the statements alleged by Plaintiff to be misleading prior to

and/or shortly after these statements were made to the Company and had the ability to prevent the statements from being made or cause the statements to be corrected.

221.    Stankey had direct and supervisory involvement in AT&T's day-to-day operations and, therefore, is presumed to have had the power to control or influence the particular practices giving rise to the securities violations as alleged herein, and exercised the same.

222.    As described above, AT&T violated Section 10(b) of the Exchange Act and SEC Rule 10b-5, causing damages to the Company as a direct and proximate result.  By reason of the foregoing, Stankey is liable for this misconduct under Section 20(a) of the Exchange Act as a controlling person of AT&T, and the Company is entitled to relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of the Company, requests judgment as follows:

A.    Finding that this action is properly maintainable as a derivative action and that demand on the Demand Board is excused as futile;

B.    Finding the Defendants liable for the claims set forth herein;

C.    Awarding damages and equitable relief in favor of the Company against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

D.    Awarding Plaintiff the costs and disbursements of this action, including attorneys', accountants', and experts' fees; and

E.    Awarding such other and further relief as this Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

ANDREWS & SPRINGER LLC

*Of Counsel*:

Chad Johnson
Noam Mandel
Jonathan Zweig
Desiree Cummings
ROBBINS GELLER RUDMAN
    & DOWD LLP
420 Lexington Avenue, Suite 1832
New York, NY 10170
(212) 432-5100

Dated:  April 3, 2024

*/s/ David M. Sborz*

Peter B. Andrews (#4623)
Craig J. Springer (#5529)
David M. Sborz (#6203)
Andrew J. Peach (#5789)
Jackson Warren (#6957)
Jacob D. Jeifa (#7070)
4001 Kennett Pike, Suite 250
Wilmington, DE 19807
(302) 504-4957

ROBBINS GELLER RUDMAN
    & DOWD LLP
Christopher Lyons (#5493)
Tayler Bolton (#6640)
1521 Concord Pike, Suite 301
Wilmington, DE 19801
(302) 467-2660

*Counsel for Plaintiff*